**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**SPRINGFIELD DIVISION**

_____
                                                          )
NATIONAL ASSOCIATION OF THE DEAF,        )
WESTERN MASSACHUSETTS ASSOCIATION   )
OF THE DEAF AND HEARING IMPAIRED,        )
and LEE NETTLES,                                        )
                                                          )
      Plaintiffs,                                      )
                                                          )
      v.                                                    )          Civil Action No. 3:11-cv-30168
                                                          )
NETFLIX, INC.,                                           )
                                                          )
      Defendant.                                       )
_____ )


<u>STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517 because this litigation implicates the interpretation and application of title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq., and its implementing regulations.[1]  Plaintiffs, an individual who is deaf and two advocacy organizations serving the interests of persons with hearing impairments, allege that Netflix has violated the ADA by failing to provide closed captioning on the vast majority of the movie and television titles offered on its "Watch Instantly" on-demand streaming video service, as well as equal access to other services offered to Netflix members (such as Netflix "recommendations" and genre-sorted movie listings).  See First Amended Complaint for Declaratory and Injunctive Relief ¶¶ 1-6, 47-56 (filed Aug. 9, 2011) (Docket # 19) ("FAC").

Streaming of video programming over the Internet—by defendant Netflix and other similar providers— has revolutionized the home entertainment industry; it is fast becoming the dominant means of delivering movies, television shows, and other entertainment offerings to the American public.  Persons who are deaf or hard of hearing should not be left behind.  A fundamental goal of the ADA is to bring persons with disabilities into the mainstream of society by requiring public accommodations (such as Netflix) to, among other things, refrain from disability-based discrimination in the provision of their goods and services and provide appropriate auxiliary aids and services when necessary to ensure effective communication.  See, e.g., 42 U.S.C. §§ 12101, 12182 (2005); 28 C.F.R. §§ 36.201, 36.202, 36.303 (2011).  The denial of equal access to, and full enjoyment of, Netflix's "Watch Instantly" service as alleged by Plaintiffs thus represents a violation of the ADA.  Accordingly, the United States has a strong interest in the resolution of this matter and

---

[1]     Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any . . . district in the United States to attend to the interests of the United States in a suit pending in a court of the United States[.]"  The Department of Justice ("Department" or "DOJ"), moreover, is the federal agency with primary responsibility for enforcing title III of the ADA and its implementing regulations.  See 42 U.S.C. §§ 12186(b), 12188(b); 28 C.F.R. pt. 36 (2011).

1

respectfully requests that this Court, for the reasons stated below, deny defendant Netflix's Motion to Dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Significantly, Netflix's motion to dismiss does *not* challenge the substantive sufficiency of plaintiffs' ADA claims. Rather, Netflix alleges that this Court lacks subject matter jurisdiction over the First Amended Complaint because: (i) the Federal Communication Commission ("FCC") has exclusive primary jurisdiction over closed captioning of video programming streamed over the Internet pursuant to the recently-enacted Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260, 124 Stat. 2751 (2010) (codified in scattered sections of 47 U.S.C.) [hereinafter "CVAA"]; and, (ii) the individual plaintiff (Nettles), as well as the two organizational plaintiffs (NAD and WMAD/HI), lack standing because they are not current Netflix subscribers. See Netflix Dismiss Mem. at 3-14. [2]

Netflix, however, cannot so easily side-step judicial adjudication of the important ADA claims in this case. First, with respect to primary jurisdiction, the CVAA contains no express language preempting ADA claims; indeed, an existing savings clause makes plain Congress' intent to reserve ADA rights and remedies when updating federal communications laws. Second, fundamental principles of statutory construction strongly counsel against interpreting the CVAA as repealing the ADA (or any of its provisions) by implication. Third, evaluation of prudential considerations in the primary jurisdiction calculus weigh heavily in favor of this Court rejecting Netflix's primary

---

2       The United States takes no position on Netflix's third dismissal argument arising under Fed. R. Civ. P. 12(b)(3) and (b)(6)—that is, that "the first-filed rule" requires dismissal (or transfer) of the instant case because it mirrors a previously-filed action currently pending in the Northern District of California (Cullen v. Netflix). See Notice of Motion and Motion to Dismiss First Amended Complaint (Or, In the Alternative, Transfer to the Northern District of California); Memorandum of Points and Authorities 2-3, 14-20 (filed Sept. 12, 2011) (Dkt # 22) ("Netflix Dismiss Mem"). Resolution of this argument calls for interpretation of state law-based claims in the Cullen complaint, as well as knowledge of facts outside the ken of the United States as a non-party.

jurisdiction argument and, thereby, permitting the parties to litigate this matter expeditiously.  Lastly, because a private plaintiff has standing to sue under the ADA whenever he or she is likely to suffer future harm absent injunctive relief, Netflix's standing-based dismissal argument has no merit.

## STATUTORY AND REGULATORY BACKGROUND

To put the recently-enacted Twenty-First Century Communications and Video Accessibility Act [hereinafter "CVAA"] into the proper legal perspective, it is helpful to understand how this Act fits into the overall framework of federal communications law governing captioning of video programming.  The Communications Act of 1934 (47 U.S.C. § 153 et seq.) was enacted originally to regulate wire and radio communications.  Over the intervening years, this Communications Act has been amended from time to time to address technological changes, as well as to improve the accessibility of communications services and devices for persons with disabilities.  Of particular relevance here are the amendments related to captioning of television programs.

In the early 1970s, captioning first appeared on television in an "open" format with text displayed on the screen for all viewers (i.e., similar to subtitles).  See generally Notice of Proposed Rulemaking, Closed Captioning of Internet Protocol-Delivered Video Programming, 76 Fed. Reg. 59,963, 59,965-66 (Sept. 28, 2011) [hereinafter "NPRM Re: Closed Captioning of IP-Delivered Video Programming"]; First Report of the Video Programming Accessibility Advisory Committee on the Twenty-First Century Communications and Video Accessibility Act of 2010 - Closed Captioning of Video Programming Delivered Using Internet Protocol 6-8 (dated July 13, 2011) [hereinafter "CVAA Advisory Comm. Report."].[3]  Later in the decade, "closed" captioning systems were

---

3       The Video Programming Accessibility Advisory Committee ("VPAAC"), a committee established by the FCC to develop recommendations on delivering video programming over the Internet, produced a report in July 2011 that is available on the FCC's website at http://www.fcc.gov/encyclopedia/twenty-first-century-communications-and-video-accessibility-act-0.

developed whereby captions could be transmitted within the television signal as encoded data to decoders—in the form of stand-alone set-top boxes or, later, integrated into the television circuitry— which allowed users to turn captioning on or off.  Id.

The advent of closed captioning systems led Congress, as well as the FCC, to update communications standards to ensure that persons who were deaf or hearing-impaired had equal access to the television medium.  First, in 1977, the FCC promulgated rules setting out technical standards for transmission and display of closed captioning as part of the television signal.  See NPRM Re: Closed Captioning of IP-Delivered Video Programming at 59,965-66.  Later, in 1990, Congress enacted the Television Decoder Circuitry Act which mandated that closed caption decoding capability be built into all new television sets (with picture sizes over 13") sold or manufactured in the United States.  See Television Decoder Circuitry Act of 1990, Pub L. No. 101-431, 104 Stat. 960 (1990) (codified at 47 U.S.C. §§ 303(u), 330(b)).

Congress nonetheless remained concerned over the following years that voluntary industry captioning efforts were not providing equal access to television programming across all delivery systems (e.g., traditional over-the-air television broadcasters, cable broadcasters, syndicated programming) for persons who are deaf or hard of hearing.  See NPRM Re: Closed Captioning of IP-Delivered Video Programming at 59,966.  Thus, in 1996, when Congress significantly revised the Communications Act to de-regulate telecommunications markets, it also added new provisions expressly mandating—for the first time—closed captioning of television programs.  See Telecommunications Act of 1996, Pub. L. No. 104-104, § 713, 110 Stat. 126 (1996) (codified at 47 U.S.C. § 613).  Congress tasked the FCC with promulgation of regulations to ensure that all television programming (referred to as "video programming") was, unless otherwise exempted, "fully

4

accessible through the provision of closed captions." 47 U.S.C. § 613(b).  Congress also granted the

FCC exclusive jurisdiction to process and resolve complaints alleging violations of the agency's

regulations.  Id. at § 613(h).  The following year, as required by the Telecommunications Act, the

FCC published its final rule on video programming accessibility.  See Closed Captioning of Video

Programming – Final Rule, 62 Fed. Reg. 48,493 (Sept. 16, 1997) (codified as amended at 47 C.F.R.

pt 79 (2010)).

After 1996, the legislative landscape with respect to federal communications law remained

fallow for nearly fifteen years.  Communication technology, however, did not stand still.  These years

witnessed not only the explosive growth of mobile technologies and devices (e.g., smart phones), but

also Internet-based communications services fueled by improved broadband coverage and

capabilities (e.g., streaming online videos, electronic messaging, video conferencing).  In 2010,

Congress took note of these technological advancements and the ways in which, to a great extent,

such technologies were not accessible to persons with disabilities.  See, e.g., The Twenty-First

Century Communications and Video Accessibility Act of 2009: Hearing on H.R. 3101 Before the H.

Comm. On Energy & Commerce, 111th Cong. (2010).

As a result, Congress passed the Twenty-First Century Communications and Video

Accessibility Act of 2010 ("CVAA") in order to update federal communications law and "to help

ensure that persons with disabilities are able to utilize communications services and equipment and to

better access video programming."  See S. Rep. No. 111-386, at 1- 4 (2010); H. Rep. No. 111-563, at

19-20 (2010).  While the CVAA addresses a wide range of advanced communications services and

devices, of particular relevance here are the provisions relating to closed captioning of video

programming delivered using Internet protocol [hereinafter referred to as "IP-delivered" or "IP-

based"].  Section 202 of the CVAA adds a new section to the Communications Act that requires the FCC, after due consideration of a report from its Video Programming Accessibility Advisory Committee ("VPAAC"), to promulgate regulations addressing closed captioning of IP-delivered video programming within six months of receiving this report (*i.e.*, by mid-January 2012).  <u>See</u> CVAA § 202(b)(2)(A) (codified at 47 U.S.C. § 613(b)(2)(A)).

The CVAA also details the legal parameters and content for the FCC's implementing regulations.  First, the CVAA specified that such regulations must require closed captioning of IP-delivered video programming *"that [has been] published or exhibited on television with captions after the effective date of the regulations."*  <u>Id</u>. (emphasis added).  Additionally, the CVAA provided that the FCC's regulations, <u>inter alia</u>, must: establish a schedule for compliance deadlines that takes into account the type of video programming (*i.e.*, pre-recorded, edited, or live); describe the responsibilities of video programming owners and providers; and, provide that *de minimis* failure to comply with the regulations should not be considered a regulatory violation. <u>See id</u>. at §§ 202(b)(2)(B)-(D) (codified at 47 U.S.C. §§ 613(b)(2)(B)-(D)).

The FCC's administrative process leading to promulgation of final regulations implementing the CVAA is well on its way, but not yet complete.  In July 2011, the VPAAC published its report. <u>See</u>  First Report of the Video Programming Accessibility Advisory Committee on the Twenty-First Century Communications and Video Accessibility Act of 2010 - Closed Captioning of Video Programming Delivered Using Internet Protocol (dated July 13, 2011) [hereinafter "VPAAC Report."].  Thereafter, in late September 2011, the FCC published its notice of proposed rulemaking for regulations implementing the CVAA's provisions addressing the delivery of IP-based captioning. <u>See</u> Notice of Proposed Rulemaking, Closed Captioning of Internet Protocol-Delivered Video

Programming, 76 Fed. Reg. 59,963 (Sept. 28, 2011) [hereinafter "NPRM Re: Closed Captioning of IP-Delivered Video Programming"].  While a detailed discussion of the NPRM is beyond the scope of this Statement of Interest, it bears noting that, in this notice, the FCC: specifies the respective obligations of CVAA-covered video programming owners and providers; declines to adopt specific technical standards for IP-delivered video programming; proposes a general performance standard whereby captioning of IP-delivered video programming must be "of at least the same quality" as the captioning of the program when shown on television; proposes a phased-in implementation schedule whereby covered programming must have compliant closed captioning within six months, twelve months, or eighteen months of publication of the final rules based on the nature of video programming; and, establishes procedures for the processing of administrative complaints.  See, e.g., id. at 3-4 (summarizing proposed regulations).

## ARGUMENT

A.    **Defendant Netflix's Primary Jurisdiction-Based Dismissal Arguments Lack Merit**

Netflix's opening salvo in its motion to dismiss rests on its assertion that this Court lacks subject matter jurisdiction over the First Amended Complaint because Congress, in the CVAA, afforded "exclusive" primary jurisdiction to the FCC over the "precise issue" raised in this Complaint—namely, "the extent to which Internet-based streaming video providers must offer closed captioning."  See, e.g., Netflix Dismiss Mem. at 3; see also id. at 1, 4-7.

In so arguing, Netflix conflates two distinct strands of primary jurisdiction doctrine: (a) the *legal* determination (based solely on statutory interpretation) whether Congress has vested an agency with exclusive jurisdiction to resolve a dispute or matter; and (b) the largely *prudential* issue whether a court presented with an otherwise jurisdictionally-proper claim or complaint, nonetheless should

deferentially "refer" such matter to an administrative agency because its input would provide requisite specialized expertise or uniformity.  Compare, e.g., Netflix Dismiss Mem. at 2, 6 (characterizing Plaintiffs' claims as falling "within the FCC's exclusive realm" and "exclusive domain") with id. at 3-4 (discussing primary jurisdiction calculus when claims, originally cognizable in federal court, nonetheless warrant referral in deference to special administrative expertise); see generally Brady v. National Football League, -- F.Supp.2d --, 2011 WL 1535240, *3-5 (D. Minn. 2011), revs'd on other grounds, 640 F.3d 785 (8th Cir. 2011); Gulf Oil Corp. v. Tenneco, Inc., 608 F. Supp. 1493, 1498-99 (E.D. La. 1985); 4 Charles H. Koch, Jr., Administrative Law and Practice § 12:23[1] (3d ed. 1997) ("Reference to an agency with primary jurisdiction should not be confused with dismissal because the administrative scheme is exclusive and does not recognize an initial judicial role.")

Under either form of primary jurisdiction analysis, however, Netflix's dismissal argument proves unavailing.  As discussed more fully below, Plaintiffs' ADA-based claims in the First Amended Complaint are jurisdictionally sound because Congress did not intend the CVAA—either expressly or by implication—to preempt the ADA.  Moreover, prudential considerations strongly counsel in favor of allowing Plaintiffs to continue prosecuting their ADA action in this Court.  Thus, defendant Netflix's argument that this case should be dismissed on primary jurisdiction grounds must fail.

**1.      *Congress Did Not Intend the CVAA to Preempt ADA-Based Claims***

It is beyond peradventure that, except as otherwise provided by Congress, federal courts have original jurisdiction of complaints arising under title III of the ADA.  See, e.g., 28 U.S.C. § 1331; 42 U.S.C. § 12188(a).  Netflix asserts that the CVAA represents just such a jurisdiction-ousting statute by virtue of its reference to the "exclusivity" of the FCC's administrative jurisdiction.  See, e.g.,

Netflix Dismiss Mem. at 2-3, 6.  Netflix's claim lacks merit.  The CVAA contains no language expressly preempting ADA claims.  Further, fundamental principles of statutory construction militate against interpreting the CVAA as repealing the ADA (or sections thereof) by implication.

Netflix's contentions notwithstanding, nowhere does the CVAA expressly preempt any federal statute, let alone particular ADA provisions.  As discussed previously, see supra pp. 5-7, the CVAA updated communications laws to ensure that persons with disabilities are able to fully utilize "advanced" communications services and devices and to better access video programming delivered using Internet protocols.  The Act is silent with respect to rights or remedies under other federal statutes.  Indeed, the exclusive regulatory jurisdiction provision on which Netflix so heavily relies was not even enacted by the CVAA, but, rather, its predecessor amendments to the Communications Act—that is, the Telecommunications Act of 1996.  See Pub. L. No. 104-104, § 713(h), 110 Stat. 126 (1996) (currently codified at 47 U.S.C. § 613(j)).[4]  The Telecommunications Act of 1996, in turn, contains the following broad savings clause:

> NO IMPLIED EFFECT.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.

Pub. L. No. 104-104, § 601(c)(1) (reprinted in 47 U.S.C. § 152, historical and statutory notes).  Because the ADA was enacted five years before the Telecommunications Act, this savings clause clearly evidences Congress's express desire to leave ADA rights and remedies intact.  See AT&T Wireless PCS, Inc. v. City of Atlanta, 210 F.3d 1322, 1328 (11th Cir. 2000) (holding that Telecommunications Act's broad savings clause preserved availability of existing § 1983 remedies);

---

4       Defendant Netflix's dismissal memorandum mistakenly cites to "§ 613(i)" when discussing the Communication Act's exclusive jurisdiction provision.  See, e.g., Netflix Dismiss Mem. at 6.  Originally codified at 47 U.S.C. § 613(h) when enacted as part of the Telecommunications Act of 1996, this provision was redesignated by the CVAA as subsection § 613(j).  See CVAA § 202(a)(2).  Due to a legislative error, however, no subsection (i) exists for § 613.  See 47 U.S.C.A. § 613(j)  (footnote notation).

Sprint Telephony PCS, L.P. v. County of San Diego, 311 F.Supp.2d 898, 915-16 (S.D. Cal. 2004) (finding the Telecommunications Act's savings clause "broad, sweeping, and a clear indication that Congress intended to leave federal laws untouched and unaltered unless they specified otherwise explicitly").

Nor can the CVAA be read as repealing by implication the judicial forum and remedies otherwise available under title III's enforcement scheme.  Implied repeals are highly disfavored and only permitted on rare occasions "when the earlier and later statutes are irreconcilable." J.E.M. AG Supply v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 145, 141-42 (2001) (internal quotation omitted); see also Morton v. Mancari, 417 U.S. 535, 550 (1974) (noting "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective"); United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 9-10 (1st Cir. 2005) (same).  Moreover, this presumption against implied repeals is even stronger where, as here, the repeal would implicate federal subject matter jurisdiction.  Lahey Clinic Hosp., 399 F.3d at 9 (citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976)).

Simply put, no irreconcilable conflict exists between title III of the ADA and § 613 of the CVAA.  Title III's broad remedial mandate generally prohibits disability-based discrimination by public accommodations in a wide range of contexts and provides for enforcement in federal courts by aggrieved parties and the Attorney General.  See 42 U.S.C. §§ 12182, 12188.  Section 613 of the CVAA, on the other hand, focuses more narrowly on regulatory standards for closed captioning of certain IP-delivered video programming (i.e., video programs previously exhibited on television) and limits enforcement to administrative complaints.  See discussion supra pp. 5-6.  More specifically, there is no inherent tension between, on the one hand, § 613's grant of exclusive FCC jurisdiction

over complaints "under this section" and, on the other hand, title III claims—such as those raised in the First Amended Complaint—alleging failure to provide equal access to Internet-delivered video programming due to lack of closed captioning and other related services.  Necessarily, Plaintiffs' title III claims arise "under" the ADA, not § 613's administrative scheme.

Thus, title III of the ADA and the CVAA can be read as coexisting capably given their differing legislative focus, requirements, forums, and remedies.  Cf. Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws . . . a court must give effect to both.") (internal citation omitted); Baumgardner v. County of Cook, 108 F.Supp.2d 1041, 1043-51 (N.D. Ill. 2000) (permitting disabled employee to assert title I-based ADA claim against county employer, as well as equal protection claim under § 1983 against individual supervisor, even when same facts formed basis for both claims).  Under such circumstances, the CVAA cannot, as a matter of law, be deemed to impliedly repeal title III of the ADA.

### 2. *Prudential Considerations Do Not Require Dismissal of Complaint Under Primary Jurisdiction Doctrine*

Turning to the prudential side of the primary jurisdiction doctrine, Netflix's dismissal argument fares no better.   Netflix's contentions notwithstanding, see Netflix Dismissal Mem. at 3, permitting Plaintiffs to litigate their claims raised in the First Amended Complaint would not invite "inevitable conflict" with either the CVAA or its implementing regulations.  Indeed, there is guaranteed to be minimal overlap—at least for the foreseeable future—between Plaintiffs' ADA claims and CVAA's implementing regulations.  The FCC's implementing regulations likely will not take full effect for about one to two years and, even then, will *only* require the provision of closed captioning of IP-delivered video programming that has been broadcast on television (with captions)

11

after the effective date.  This low risk of potential conflict with CVAA regulatory requirements in the foreseeable future, when balanced against the harm to Plaintiffs from unduly delaying prosecution of their ADA claims, strongly counsels in favor of rejecting Netflix's request for dismissal based on primary jurisdiction.

Generally speaking, in its prudential form, primary jurisdiction is aimed at maintaining proper relationships between federal courts and administrative agencies charged with particular regulatory tasks.  Primary jurisdiction is not applicable simply because a claim or issue may conceivably fall within (or overlap with) an agency's purview.  See, e.g., Brown v. MCI Worldcom Network Services, Inc., 277 F.3d 1166, 1172 (9th Cir. 2002); New York State Thruway Auth. v. Level 3 Communications, LLC, 734 F.Supp.2d 257, 265 (N.D.N.Y. 2010).  Rather, while there is no fixed formula for applying the primary jurisdiction doctrine, United States v. Western Pacific R.R. Co., 352 U.S. 59, 64 (1956), the touchstones are specialized agency expertise or a need to ensure national uniformity in the context of a comprehensive regulatory scheme.  See, e.g., American Auto. Mfrs. Ass'n v. Massachusetts Dept. of Envt'l Prot., 163 F.3d 74, 80-82 (1st Cir. 1998); see also U.S. Public Interest Research Grp. v. Atlantic Salmon of Maine, LLC, 339 F.3d 23, 34 (1st Cir. 2003).  Federal courts must also weigh the advantages of invoking primary jurisdiction against the potential harm from judicial forbearance.  American Automobile Ass'n, 163 F.3d at 81-82.  For such reasons, federal courts—including this Circuit—often caution that primary jurisdiction should be invoked "sparingly."  See, e.g., U.S.P.I.R.G., 339 F.3d at 34; Locust Cartage Co. v. Transamerican Freight Lines, Inc., 430 F.2d 334, 340 n.5 (1st Cir.), cert. denied, 400 U.S. 964 (1970); Palmer Foundry, Inc., v. Delta-Ha, Inc., 319 F.Supp.2d 110, 112 (D. Mass. 2004) (characterizing invocation of primary jurisdiction as "rare").

With these legal guideposts framing the primary jurisdiction calculus, there is no cogent reason to dismiss the First Amended Complaint. Prudential considerations counseling against a finding of primary jurisdiction include the following:

**(a).** Because the captioning requirements set forth in § 613(c)(2)(A) of the CVAA do not apply to IP-delivered video programming exhibited on television prior to the regulatory effective date(s), the entirety of Netflix's *current* "Watch Instantly" video library—as well as any movies or television shows added prior to the effective date(s)—falls outside the purview of that Act. Plaintiffs' allegations that Netflix violates title III of the ADA when failing to provide equal access to other services offered to Netflix members (such as Netflix "recommendations" and genre-sorted movie listings) likewise falls outside both the CVAA and the FCC's administrative jurisdiction. Dismissal of the First Amended Complaint would thus leave Plaintiffs without a forum (or legal remedy) for their ADA claims to the extent they relate to Netflix's conduct that is not covered by the CVAA or its implementing regulations.

**(b).** At this stage of the proceedings, Plaintiffs' ADA claims present straightforward statutory interpretation and liability issues that Congress committed to the federal courts, not the FCC, for resolution—namely: (a) whether Netflix is a "public accommodation" covered by title III of the ADA (42 U.S.C. § 12182); and, (b) if so, whether Netflix has violated title III by failing to provide closed captioning on the vast majority of the movies and television titles offered on its "Watch Instantly" on-demand streaming video service, as well as equal access to other services offered to Netflix members. See FAC ¶¶ 14-27, 46-56. Resolution of these issues does not require specialized expertise beyond the typical ken of federal courts. Nor would adjudication of these issues require interpretation or application of the CVAA or the FCC's forthcoming implementing

13

regulations.[5]  Indeed, other federal courts have, under analogous circumstances, declined to exercise primary jurisdiction.  See, e.g., National Commc'ns Ass'n, Inc., v. American Tel. and Tel. Co., 46 F.3d 220, 223-24 (2nd Cir. 1995) ("NCA II")  (finding district court erred when granting referral to FCC based on primary jurisdiction when billing dispute between telecommunications companies did not involve technical tariff issues); New York State Thruway Auth., 734 F.Supp.2d at 267-71 (stating that "primary jurisdiction does not apply to questions within the conventional competence of the courts") (internal citation omitted); AT&T Commc'ns v. City of Austin, 975 F. Supp. 928, 939 (W.D. Tex. 1997) (ruling primary jurisdiction inapplicable when resolution of threshold preemption issue under the Telecommunications Act of 1996 required conventional legal knowledge, rather than the FCC's specialized expertise), vacated as moot, 235 F.3d 241 (5th Cir. 2000).

   **(c).**     There appears to be little danger of inconsistent rulings between this Court and the FCC in the near term given the likelihood of phased-in implementation deadlines for CVAA-required closed captioning of IP-delivered video programming.  The FCC has indicated it will issue its final rule in mid-January 2012.  See NPRM Re: Closed Captioning of IP-Delivered Video Programming at 3; see also 47 U.S.C. § 613(c)(2)(A).  If the implementation schedule in the final rule remains the same as proposed in the NPRM, deadlines for the provision of closed captioning of covered IP-delivered video programming would range from July 2012 for unedited programming (i.e., six months after mid-January 2012) to July 2013 for  prerecorded and edited programming (i.e., eighteen months after mid-January 2012).  See discussion supra pp. 6-7.  In light of this regulatory timeframe, there would appear to be minimal risk that this action would result in legal standards for closed

---

5        Of course, should any future remedial proceedings in this ADA litigation present technical or other issues enmeshed with the CVAA, this Court may always revisit the necessity of referring certain CVAA-specific matters to the FCC.  See, e.g., National Commc'ns Ass'n, 820 F. Supp. 139, 141 (S.D.N.Y. 1993) ("NCA I").

captioning that are inconsistent with CVAA's implementing regulations because much (if not all) of this litigation could be completed before July 2013.  See, e.g., NCA II, 46 F.3d at 225 (noting, when reversing district court's referral to FCC based on primary jurisdiction: "Since the district court can conclude this matter far more expeditiously, a potential delay of even two years more than outweighs any benefit that might be achieved by having the FCC resolve this relatively simple dispute").

      **(d).**    The Court also needs to be mindful of the potential harm to Plaintiffs were this action dismissed to await the full implementation of the FCC's final regulations.  No matter the content of these final regulations, Plaintiffs will still need to pursue discovery on their ADA claims.  Dismissal of the complaint would thus do little more than delay needed discovery and impede the expeditious disposition of this litigation.  Under such circumstances, this Court should decline to grant defendant Netflix's primary jurisdiction-based dismissal request.  As one federal court noted when declining to stay litigation pending the FCC's ruling on a preemption petition: "Courts should resist the temptation of passing the issue off to another entity for the sake of judicial economy and should hold fast to [their] 'unflagging obligation . . . to exercise the jurisdiction given [to them].'"  New York State Thruway Auth., 734 F.Supp.2d at 268 (quoting Tassy v. Brunswick Hosp. Center, Inc., 296 F.3d 65, 73 (2nd Cir. 2002)).

      Against the substantial force of the foregoing considerations, Netflix offers only the counterweight of Zulauf v. Kentucky Educational Television, 28 F.Supp.2d 1022 (E.D. Ky. 1998).  See Netflix Dismiss Mem. at 4-9.  In Zulauf, a plaintiff sued an educational broadcaster (KET) alleging violations of the ADA and the Rehabilitation Act due to failure to provide closed captioning for some television programming.  Defendant KET moved to dismiss based on the FCC's exclusive jurisdiction over issues relating to television captioning pursuant to § 613(h) of the

15

Telecommunications Act of 1996.  Id. at 1023.  After noting that the Telecommunications Act did not

preempt the ADA or Rehabilitation Act, the district court nonetheless concluded that primary

jurisdiction considerations warranted dismissal so that plaintiff could exhaust his administrative

remedies with the FCC before pursuing his civil rights complaint.  Id. at 1023-24.  The court

dismissed the action based on its belief that, because resolution of plaintiff's civil rights claims would

require interpretation of the Telecommunications Act and the FCC's implementing regulations,

judicial resolution of plaintiff's civil rights claims—at least in the first instance—would be

"inefficient and a waste of judicial resources." Id. at 1024.

 Zulauf, however, is inapplicable here for two significant and obvious reasons. First, Zulauf

presented an entirely different procedural posture vis-à-vis the federal litigation and the FCC's

administrative proceedings.  Whereas, in Zulauf, the FCC's television captioning regulations were

already in place when the complaint was filed, there is no such regulatory framework in place here.

As noted above, see supra pp. 6-7, the FCC will not be issuing final regulations to implement the

CVAA until mid-January 2012 and, even then, it will still be another six to eighteen months before

such regulations become fully effective for all types of IP-delivered video programming.  This Court

thus need not be concerned that its efforts would be duplicative of any CVAA-related FCC

proceedings because presently, as Gertrude Stein famously said, "there is no there there."  Gertrude

Stein, Everybody's Biography (1937).

 Second, for related reasons, Zulauf is distinguishable by the degree to which issues raised in

that civil rights complaint were enmeshed with regulatory issues within FCC's jurisdiction.  Indeed,

in Zulauf, there was *complete* overlap between the plaintiff's claims under the ADA and

Rehabilitation Act and his rights under the Telecommunications Act because each civil rights claim

mirrored a potential administrative claim under the FCC's implementing regulations. Here, by

contrast, *none* of Plaintiffs' ADA claims (at present) mirror potential CVAA-related administrative

claims. That is, even assuming the FCC's regulations implementing the CVAA were already in

place, the CVAA only applies to closed captioning of IP-based video programming which has been

exhibited on television (with captions) after the applicable regulatory effective date. See 47 U.S.C.

§ 613(c)(2); see also NPRM Re: Closed Captioning of IP-Delivered Video Programming at 4, 13-16.

(discussing proposed phased-in implementation schedule for CVAA-required closed captioning).

Plaintiffs' ADA claims premised on Netflix's failure to provide closed captioning for video

programming exhibited prior to the applicable regulatory effective date—which, currently, represents

the entirety of the complaint—simply have no administrative counterpart. Moreover, also falling

outside the FCC's administrative jurisdiction are Plaintiffs' allegations that Netflix violates title III of

the ADA by failing to provide equal access to other services offered to Netflix members (such as

Netflix "recommendations" and genre-sorted movie listings).

Under such circumstances, referral of Plaintiffs' complaint to the FCC would be futile

because the Commission has no jurisdiction over these ADA claims. Cf. Community Television of

Southern California v. Gottfried, 459 U.S. 498, 892-893 (1983) (holding FCC lacked original

jurisdiction to adjudicate Rehabilitation Act claims).

**C.      Plaintiffs Have Standing to Assert Their ADA Claims**

Netflix also moves for dismissal under Fed. R. Civ. P. 12(b)(1) on the ground that Plaintiffs

lack standing. See Netflix Dismiss Mem. at 2, 10-14. Netflix argues that, because neither the

individual plaintiff (Nettles) nor the members of the two organizational plaintiffs (NAD and

WMAD/HI) identified in the First Amended Complaint are current Netflix members, they fail to

allege particularized injuries sufficient to create standing.  Id. at 10-12.  Nor can Plaintiffs assert the

"futile gesture" exception, Netflix contends, because they lack actual knowledge of Netflix's

captioning practices.  Id. at 11-14.  Netflix's arguments, however, misapprehend standing

requirements for claims under title III of the ADA.  Plaintiffs indeed have standing to assert the ADA

claims in their First Amended Complaint.

First, Netflix erroneously focuses on Plaintiffs' past injuries (or, according to Netflix, the lack

thereof) to assess standing.  Under the ADA, however, a private plaintiff has standing to seek

injunctive relief when alleging that he or she is likely to suffer future harm absent injunctive relief.

See City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983); accord Disabled Amer. for Equal

Access, Inc. v. Ferries del Caribe, Inc., 405 F.3d 60, 65 (1st Cir. 2005).  Because an injunction is

prospective relief, the injury that enables the plaintiff to seek an injunction is the threat of future

harm, not the past harm.  See Lyons, 461 U.S. at 102; Nelsen v. King County, 895 F.2d 1248, 1251

(9th Cir. 1990) (stating that the existence of past harm is "largely irrelevant" to determining whether

plaintiff has standing to seek injunctive relief).  Moreover, there is no requirement that a plaintiff

have suffered an injury in the past in order to have standing to prevent future harm.  For standing

purposes, the alleged harm may be "actual or imminent" as long as it is not "conjectural or

hypothetical."  Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (quoting Lyons, 461 U.S. at 101-

102); accord Department of Commerce v. United States House of Representatives, 525 U.S. 316, 324

(1999).  Thus, courts often grant injunctions to prevent future harm, even though the threatened harm

has not yet occurred.  See, e.g., Dimarzo v. Cahill, 575 F.2d 15, 18 (1st Cir.), cert. denied, 439 U.S.

927 (1978); Cutler v. Kennedy, 475 F. Supp. 838, 848 (D.D.C. 1979).  In such cases, the risk of

future harm that violates a statutory or constitutional provision "constitutes a distinct and palpable

injury" sufficient to establish standing.  Id.

Second, Netflix too readily dispatches title III's "futile gesture" provision.  Section 308(a)(1) of the ADA states, in relevant part, that

> [n]othing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.

42 U.S.C. § 12188(a)(1).  This provision makes plain that a plaintiff may bring suit against a non-compliant covered entity without first subjecting himself or herself to the humiliation, burden, or expense of attempting to access inaccessible services or enter an inaccessible facility.  Once a plaintiff has actually become aware of an accessibility barrier or discriminatory policy, and is deterred thereby from visiting or patronizing the public accommodation, he or she has suffered injury sufficient to confer standing.  See, e.g., Dudley v. Hannaford Bros. Co., 333 F.3d 299, 306-307 (1st Cir. 2003) (stating that courts should interpret "futile gesture" provision generously in light of remedial purpose underlying ADA); Pickern v. Holiday Quality Foods, Inc., 293 F.3d 1133, 1136-37 (9th Cir.) (ruling that injury under ADA accrues once plaintiff is aware of discriminatory condition and is thereby deterred), cert. denied, 537 U.S. 1030 (2002); Fiedler v. Ocean Front Properties, Ltd., 683 F.Supp.2d 57, 67-68 (D. Me. 2010) (holding that prospective disabled patron had standing to sue hotel under title III despite cancelling reservation and never visiting hotel because communications with hotel staff and research gave him actual knowledge of barriers in room, which conferred standing).

Netflix's narrow reading of the "futile gesture" provision thus cannot be squared with either the text of § 12188(a)(1) or the ADA's underlying remedial goals.  Under Netflix's view, Plaintiffs would have to become Netflix members, pay the associated monthly subscription fee, and attempt to

watch (and comprehend) one or more uncaptioned movies via the "Watch Instantly" service before being permitted to bring suit *even though*—as Plaintiffs allege in the First Amended Complaint (see FAC ¶¶ 5, 17-27, 30-41) and Netflix concedes (see Netflix Dismiss Mem. at 1; McDowell Dec., Exs. A, C, E (blog posts by Netflix Chief Product Officer); FAC ¶¶ 17-20)—the majority of movies currently available for online streaming through "Watch Instantly" lack captions or subtitles.  Such an interpretation not only contravenes the plain language of the statute, it leads to results that directly conflict with the ADA's remedial purpose.  Plaintiffs would have to subject themselves to the very conduct that the ADA was intended to prevent in order to obtain relief.  The ADA does not require such a result.  So long as a plaintiff adequately alleges that he or she would likely use a public accommodation in the future if accessibility barriers were removed, which Plaintiffs have done in the First Amended Complaint, the presence of those barriers can properly be said to cause injury.  See Independent Living Resources v. Oregon Arena Corp., 982 F. Supp. 698, 707 n.4 (D. Or. 1997); cf. International Bhd. of Teamsters v. United States, 431 U.S. 324, 365-366 (1977) (persons who have not applied for employment may, under some circumstances, receive equitable relief under Title VII).

## CONCLUSION

For the foregoing reasons, defendant Netflix's motion to dismiss under Fed. R. Civ. P. 12(b)(1) based on primary jurisdiction and standing should be rejected.

Dated: October 3, 2011

Respectfully submitted:

Thomas E. Perez
Assistant Attorney General
Civil Rights Division

Carmen M. Ortiz
United States Attorney

Eve Hill
Senior Counsel to the Assistant Attorney General
Civil Rights Division

Allison J. Nichol, Chief
Kathleen P. Wolfe, Acting Special Legal Counsel
Alberto Ruisanchez, Acting Deputy Chief
Disability Rights Section

  /s/ Gretchen E. Jacobs
Gretchen E. Jacobs

Senior Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
1425 NY Avenue Building
Washington, D.C.  20530
(202) 514-9584
(202) 307-1198 (fax)
gretchen.jacobs@usdoj.gov

Counsel for United States of America

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 3, 2011, I electronically filed the **Statement of Interest of the United States of America in Opposition to Defendant's Motion to Dismiss First Amended Complaint** with the Clerk of the Court using the CM/ECF system which will send Notices of Electronic Filing (NEF) to all registered participants and that paper copies will be sent to those counsel listed as non-registered participants on this same date.


  <u>/s/ Gretchen E. Jacobs</u>

GRETCHEN E. JACOBS
Senior Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
1425 N.Y. Avenue Building
Washington, D.C. 20530

(202) 514-9584
(202) 307-1198 (fax)
gretchen.jacobs@usdoj.gov

Counsel for United States of America