UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

WESTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, WESTERN MASSACHUSETTS ASSOCIATION OF THE DEAF AND HEARING IMPAIRED AND LEE NETTLES,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>NETFLIX, INC., a corporation,<br>　　　　　　Defendant. | CIVIL ACTION NO. 11-30168-MAP<br><br>UPDATED JOINT STATUS REPORT |

## I.　　INTRODUCTION:　BACKGROUND AND SUMMARY

Following the expiration of the stay granted by this Court through March 14, 2012 (*see* ECF Nos. 34–36), and pursuant to this Court's November 10, 2010 Order (ECF No. 32), the parties submit this Joint Status Report addressing the Parties' (1) positions as to the impact of the Federal Communication Commission's ("FCC") January 12, 2012 Report and Order ("FCC's Report and Order," or "FCC regulations") adopting rules under the Twenty-First Century Communications and Video Accessibility Act of 2010 ("CVAA");[1] (2) positions as to the impact of the FCC's Report and Order on this litigation; and (3) proposed discovery and litigation schedules.

---

[1] FCC Report and Order, *In re Matter of Closed Captioning of Internet Protocol-Delivered Video Programming:  Implementation of the Twenty-First Century Communications and Video Accessibility Act of 2010*, MB Docket No. 11-154 (Adopted Jan. 12, 2012, Released Jan. 13, 2012), attached hereto as Exhibit A.

As the Court is aware, this case involves a single claim by deaf and hard of hearing Plaintiffs against Netflix, Inc. ("Netflix"), seeking declaratory and injunctive relief under Title III of the Americans with Disabilities Act ("ADA") to require Netflix to closed-caption "Watch Instantly" Internet-protocol-based streaming content.  On November 10, 2010, this Court denied Netflix's motion to dismiss, but stayed the case pending issuance of regulations by the FCC implementing the CVAA.  (ECF No. 32 at 2.)  The Court directed that it would stay the litigation until February 6, 2012, at which time the parties were to submit a status report with copies of any materials issued by the FCC, and proposed schedules for completion of pretrial proceedings. (*Id.*)

At the Parties' request, the Court directed that it would stay the litigation until March 14, 2012, to allow the parties to engage in settlement discussions.  The Parties have not reached a settlement, although they hope to continue dialogue.  Accordingly, they have prepared this Joint Status Report.

As set forth in more detail below, with the stay expired, the Parties are addressing the Court's previous Order of November 10, 2011.  In brief, Plaintiffs and Netflix disagree over the import of the FCC's Report and Order for this case, and the proposed schedules for discovery and litigation.  Plaintiffs plan to initiate discovery to keep the case moving, while Netflix proposes a motion for judgment on the pleadings and argues discovery should not proceed during this phase.  The Parties have set forth their (separate) proposed schedules below, along with separate proposed orders.

## II.  THE PARTIES' POSITIONS AS TO THE IMPACT OF THE FCC'S REPORT AND ORDER ON THIS LITIGATION.

As the Court recognized, the Parties might have different positions as to the impact of the FCC's rules on this case.

## A.     Plaintiffs' Position

Plaintiffs agree that the FCC's Report and Order is helpful in the areas identified by the Court, in terms of providing general background and context for discovery, and also agree that the regulations may become relevant at the remedies stage and/or as part of the analysis of any "undue burden" claimed by Netflix as an affirmative defense.  Specifically, the Court indicated several areas in which the FCC implementation of CVAA could be helpful to this case:  (1) general background on captioning including commentary from "economists and industry people and interested groups who are protecting the rights of people who are hard of hearing and deaf," (Transcript of Motion Hearing Held on Nov. 8, 2011, at 16:11-18), attached hereto as Exhibit B ("Tr.")); (2) the FCC's analysis of the burdensomeness of captioning (Tr. at 14:6-19, 16:11-18, 33:10-34:10); (3) shaping both fact and expert discovery (Tr. at 16:19-24); and (4) managing the case in the pretrial phase (Tr. at 41:17-21).

As Plaintiffs discussed in their Opposition to Netflix's Motion to Dismiss (ECF No. 26, "Pls.' Opp'n."), however, and consistent with the position taken by the Department of Justice ("DOJ") in its Statement of Interest (ECF No. 24), Plaintiffs' claim under the ADA remains largely unaffected by the FCC's interpretation of the CVAA.  Among other reasons previously articulated by Plaintiffs and the DOJ as to why neither the CVAA nor its proposed regulations *determine* Plaintiffs' claim under the ADA are the following:  (1) the FCC regulations implement the CVAA, not the ADA (*see* Pls.' Opp'n. at 5 ("CVAA grants FCC exclusive jurisdiction "with respect to any complaint *under this section*."…This provision simply means that all claims brought under CVAA itself must be submitted to the FCC.  It does not apply to claims brought under the ADA…Congress did not assign FCC the task of implementing the ADA; among federal agencies, the DOJ has this responsibility.")); (2) CVAA (and thus, necessarily, the FCC

3

regulations) ensure captioning for programming shown only on television, not all video content

shown over the Internet and will thus only affect a portion of Netflix's library (*see* Pls.' Opp'n.

at 7 ("Primary jurisdiction must also be rejected because the FCC could not provide full relief in

this case, as CVAA only applies to a limited subset of the content of Netflix's streaming

library…")); and (3) the ultimate determination of undue burden under the ADA is an

individualized analysis, not a general one for the economy as a whole.  (*See* Pls.' Opp'n. at 8.)

The significance of Plaintiffs' claim being under the ADA, and not CVAA, was also underscored

in DOJ's Statement of Interest:

> At this stage of the proceedings, Plaintiffs' ADA claims present straightforward statutory interpretation and liability issues that Congress committed to the federal courts, not the FCC, for resolution—namely: (a) whether Netflix is a "public accommodation" covered by title III of the ADA (42 U.S.C. § 12182); and, (b) if so, whether Netflix has violated title III by failing to provide closed captioning on the vast majority of the movies and television titles offered on its "Watch Instantly" on-demand streaming video service, as well as equal access to other services offered to Netflix members.

(ECF No. 24, at 13.)

The Court recognized that neither the CVAA itself, nor its implementing regulations,

would determine the outcome of this case when it stated that "the FCC may come out with

regulations that I decide are inconsistent with the ADA.  I'm not bound by what the FCC does."

(Tr. 9:11-13; *see also* Tr. at 34:4-6 ("I can strike the balance differently and I recognize that I

have not only the power to do that but the responsibility to do that if I think it's appropriate.")

As previously mentioned in Plaintiffs' Opposition (at 6), "Congress has specifically assigned to

the federal courts the authority to resolve claims arising under the ADA and its regulations.

Courts are reluctant to forego jurisdiction when Congress has bestowed it."

Netflix's argument below that the ADA applies only to physical places of public

accommodation is also misplaced.  In *Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n,* 37 F.3d

12 (1st Cir. 1994), the First Circuit held that the health care plans of individuals living with AIDS are places of public accommodation, despite the fact that such plans are not physical structures.  *See id.* at 19 (holding that "[w]hether establishments of 'public accommodation' are limited to actual physical structures is a question of first impression in this Circuit…we find that they are not so limited."); *see also Tompkins v. United Health Care of New England*, 203 F.3d 90, 95 (1st Cir. 2000); *Fletcher v. Tufts Univ.*, 367 F. Supp. 2d 99, 115 (D. Mass. 2005); *Conners v. Maine Med. Ctr.,* 42 F. Supp. 2d 34, 46 (D. Me. 1999); *Boots v. Northwestern Mutual Life Ins.*, 77 F. Supp. 2d 211, 216 (D.N.H. 1999); *Doukas v. Metropolitan Life Ins. Co.*, 950 F. Supp. 422, 427 (D.N.H. 1996).  Moreover, the Supreme Court has stated that the definition of public accommodation "should be construed liberally."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676 (2001).

To the extent that Netflix plans to argue that the FCC Report and Order determine the outcome of this case, Plaintiffs believe that any motion for judgment for the pleadings based on this argument would cause unnecessary delay.  The proposed regulations had been issued at the time of Netflix's first Motion to Dismiss, and the final FCC regulations are largely unchanged from the proposed regulations.  Further, by their nature as implementing regulations, the FCC regulations cannot displace the ADA where their underlying statute (CVAA) does not; thus, no motion for judgment on the pleadings could succeed based on the regulations alone.

Responding to some of Netflix's specific points below, while reserving the right to offer further arguments if necessary, Plaintiffs note the following about the FCC regulations:

First, that the FCC has exclusive jurisdiction over complaints under the CVAA is irrelevant to this case where Plaintiffs' claims are brought under the ADA, and Netflix continues to ignore the savings clause in the relevant statutory sections of the CVAA, which explicitly

preserves responsibilities under all other laws, including, of course, the ADA.  As that savings

clause states (and as previously pointed out by DOJ), the statute into which CVAA was

incorporated states that it has "NO IMPLIED EFFECT:  This Act and the amendments made by

this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless

expressly so provided in such Act or amendments.  (*See* ECF No. 24 at 9, *citing* Pub. L. No. 104-

104, § 601(c)(1) (reprinted in 47 U.S.C. § 152, historical and statutory notes).)  Nothing in

CVAA expressly provides that the ADA is displaced (nor does or could the FCC regulations so

provide).

Second, that the regulations assign captioning responsibilities to video content owners

(including movie and television studios), in no way undermines that distributors like Netflix bear

responsibilities under both CVAA and the ADA.  Indeed, the CVAA's imposition of

responsibilities on video content owners will lessen any burden on Netflix to fulfill its

responsibilities under both the ADA and CVAA, a fact that may become relevant as part of any

undue burden analysis and/or at the remedies stage when crafting timelines for compliance.  For

example, within 18 months of publication in the Federal Register *all* video owners of captioned

televised programming will have to provide a corresponding caption file to distributors like

Netflix, which will reduce Netflix's overall cost or providing captions on all of its content,

whether or not programming is subject to CVAA.  (Report and Order ¶ 126.)

Third, it is significant that the FCC did not mandate a standard delivery or interchange

format.  It adopted SMPTE-TT as a safe harbor interchange and delivery format because it would

"provide certainty while enabling the industry to continue to innovate and it permitted parties to

agree to use an alternative standard." (Report and Order ¶ 126.)

Fourth, the technical standards adopted by the regulation as a "safe harbor," SMPTE-TT are what Netflix currently uses, requiring no change in how Netflix delivers captioned programming.  *See* First Report of the Video Programming Accessibility Advisory Committee on the Twenty-First Century Communications and Video Accessibility Act of 2010 at 18, http://transition.fcc.gov/cgb/dro/VPAAC/First_VPAAC_Report_to_the_FCC_7-11-11_FINAL.pdf (Last visited March 14, 2012).  Moreover, the regulations provide flexibility in meeting technical standards, as parties opting to use a different standard would not need to first request the FCC's approval and would be deemed in compliance if the different format "achieve[s] the same functionality without implementing the standard." (Report and Order ¶ 126.)

Fifth, Plaintiffs do not dispute that the compliance schedule implemented by CVAA as to the limited subset of content CVAA covers may very likely be relevant in crafting a compliance schedule for Netflix under the ADA, at least as to the content covered by CVAA.  (Report and Order ¶¶ 51-52.)  It is noteworthy that the FCC found that a deadline lengthier than six months, twelve months or eighteen months depending on type of content was "not justified because of support for the proposed deadlines in the record and by the VPAAC, which demonstrates that the proposed deadlines appear to be achievable on an industrywide basis." (*Id* at ¶ 52.)  Moreover, the lengthier timelines of twelve and eighteen months were for live or near-live programming, not the kind of content more typical of prerecorded content aired on Netflix, that would not be subject to CVAA.

Sixth, the regulations do not cover all programming delivered to consumers using internet protocol—nor could they, as the law does not provide them that authority.  Rather, the regulations cover only programming shown on television after the effective date of the

publication of regulations in the Federal Register, which has not yet occurred.  47 U.S.C.

§ 613(c)(2)(A).  Netflix misunderstands the comments and the regulations it discusses below,

which, expressly state that they apply to content shown on television and support Plaintiffs'

position.  In fact, some commenters argued that television programming would not be covered if

it was already in the library of video programming and owners, but the FCC determined that all

programming, regardless of when it would be acquired, would be subject to CVAA once it was

shown on television after the effective date of the regulations. As stated in the FCC regulations:

> We interpret Section 202(b) to cover any programming delivered to consumers using IP, provided that the programming was published or exhibited on *television with captions* after the effective date of the regulations. We believe that this interpretation is consistent with the language, history, and purpose of the statute. The statutory phrase "after the effective date of such regulations" does not modify "programming delivered using Internet protocol"; rather, it modifies the phrase "*published or exhibited on television with captions.*" Thus, whether the VPO delivered the programming to the VPD before or after the effective date of the regulations is irrelevant to whether the programming is covered by the statute. (Emphasis added.)

(Report and Order ¶ 35.)

## B.     Netflix's Position

Plaintiffs suggest that the FCC regulations would have minimal impact on their ADA

claim and assert it should go immediately into expensive discovery before giving the parties an

opportunity to brief the impact of the regulations on Plaintiff's claim.  Netflix disagrees.

In Netflix's view, Plaintiffs are attempting to apply the ADA in a manner not supported

by Congress's intent, and in a way no court has done so before:  to require closed captioning on

Internet-based streaming video content.  The recent and specific CVAA, the scope and meaning

of which the FCC's regulations and Report and Order help elucidate, undermines Plaintiffs'

interpretation of the ambiguous and general ADA.  *New England Legal Found. v. Mass. Port

Auth.*, 883 F.2d 157, 173 (1st Cir. 1989) ("we are duty bound" to interpret all statutes in "logical

and uniform fashion"); *see Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 228 (1st Cir. 2003) ("in statutory construction, the specific controls the general") (citation and quotation omitted); *Wilson v. Marchington*, 127 F.3d 805, 809 (9th Cir. 1997) ("a later legislative act can be regarded as a legislative interpretation of an earlier act and is therefore entitled to great weight in resolving any ambiguities and doubts."). Until the regulations were promulgated, however, the Court could not fully consider the extent to which CVAA affect the viability of Plaintiffs' interpretation of the ADA.

As the Court is aware, the FCC was engaged in notice-and-comment procedures for its streaming closed captioning regulations throughout briefing and the hearing on Netflix's motion to dismiss. At the November 8, 2011 hearing, the Court noted that the FCC's Report and Order would enlighten the Court's view of Plaintiffs' claims, and explained that a motion for judgment on the pleadings—after the regulations were promulgated, but before discovery ensued—may be the proper mechanism for resolving the threshold legal issue of whether Plaintiffs raised a viable ADA claim.[2]

Indeed, the Court recognized the regulations could conceivably have supported a dispositive motion for *either* party—precluding either Plaintiffs' claims or Netflix's defenses. (Tr. at 9:10–11 (suggesting the Parties "go directly to a motion for judgment on the pleadings"); *see* 46:3–10 (noting Netflix or Plaintiffs may "really want to move to dismiss" after the regulations are published)).

On the one hand, Netflix's position would be supported by captioning guidelines that are "*inconsistent*" with Plaintiff's conception of the ADA, and thereby show Plaintiffs' position is

---

[2] Plaintiffs state that proposed regulations were complete at the time of Netflix's motion to dismiss. Although proposed regulations had been issued, the FCC had neither finalized them nor completed the Report and Order explaining the rationale behind the regulations.

not viable in light of the CVAA and regulations.  (Tr. at 9:10–11 (emphasis added))  On the other

hand, the FCC might have concluded that "closed captioning must be provided in a manner

which is entirely consistent with the ADA, or the burdensomeness on providers such as Netflix is

negligible compared to the imposition upon people who are hearing impaired," in which case

Netflix would "have an elephant in [its] lap" and Plaintiffs would have grounds for its own

motion for judgment on the pleadings.  (Tr. at 23:4–10.)

     As it turned out, the finished regulations tilt heavily in favor of Netflix and against

Plaintiffs' novel interpretation of the ADA, which, by its terms, applies only to actual, physical

"*places* of public accommodation" 42 U.S.C. §§ 12181, 12182, not to Internet-based

abstractions—particularly where, as here, a specific statutory scheme and its implementing

regulations create a comprehensive and exclusive means of providing relief Plaintiffs seek in this

case.  The main case Plaintiffs cite above — *Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n,*

37 F.3d 12 (1st Cir. 1994), in which the First Circuit struggled to interpret the "general and

ambiguous" language of §§ 12181 and 12182 in context of discriminatory insurance policies —

underscores (not conflicts with) Netflix's position that the CVAA and FCC's regulations would

help the Court determine that the ADA does apply in the way Plaintiffs contend.  *Id.* at 19.

There, the First Circuit noted the ADA's "general and ambiguous" language required the court to

look to extra-textual sources to determine whether the ADA applied to insurance policies. *Id.* at

19.  Little more than the ADA's limited legislative history was available, and the court

interpreted the ADA with that limited aid.  *Id.* at 19–20.  Here, the Court has the benefit of a

detailed statutory scheme—and now, the detailed regulations—to help it interpret the statute in

the special context of closed captioning of streaming video content.

     

By filling the gap left by the ADA, the FCC's now-complete regulations confirm the ADA does not apply in this context, and would have been unnecessary, redundant, and pointless if the ADA created liability in the way Plaintiffs argue.

Thus, in its heavily annotated 78-page, 135-paragraph Report and Order, the FCC drafted its final rules to address exactly the issue Plaintiffs raise with their ADA claim: to ensure Netflix and similar streaming content providers provide access to Internet-based streaming video content through closed captioning. (FCC Report and Order ¶ 1 ("The rules we adopt here will better enable individuals who are deaf or hard of hearing to view IP-delivered video programming, as Congress intended.").) To that end, the regulations

- preclude "private rights of action" concerning captioning under the CVAA in favor of a formal administrative "complaint procedure" (*id.* ¶¶ 75–91; *see also id.* ¶ 77 & n. 310);

- allocate primary responsibility for closed captioning under the CVAA to video content owners, while requiring video content distributors to "pass-through" owners' captioning to consumers (Report and Order ¶¶ 15–32);

- define safe-harbors from under which certain entities, including distributors like Netflix, are "protected from liability" under the CVAA (*id.* ¶¶ 16, 67–74, 124);

- create mandatory grace periods and timelines for compliance with the FCC regulations (*id.* ¶¶ 28–35, 51–60);

- define technical standards for implementing closed captioning on streaming video content (*id.* ¶¶ 33–39, 124–126); and

- explain that the FCC Regulations apply to *all* streaming content exhibited on television after the publication of the regulations (*id.* ¶ 35).

These rules account for several considerations not addressed by Plaintiffs' proposed application of the ADA: ensure consistent and predictable industry-wide standards; avoid stifling innovation in the still-developing realm of streaming content; allocate responsibility to the entities that could most efficiently provide captioning; address countervailing copyright and other legal interests; and ensure entities employ the most effective captioning standards.

Netflix strongly believes a motion for judgment on the pleadings would show that Plaintiffs' view of the ADA is impermissibly "inconsistent" with the FCC regulations. If the Court considered briefing *before discovery*, which is unnecessary for this determination, the Parties and the Court could better use their resource elsewhere (such as continuing its captioning efforts), then turn to discovery issues *if* the regulations do not dispose of the case.

As briefly summarized below, Netflix intends to raise at least six ways the regulations undermine Plaintiffs' claims as a matter of law—without discovery.

*First*, the regulations confirm what Netflix previously argued: that the they "preclude[] private rights of action," create an extensive "complaint procedure" to address captioning issues, and grant the FCC "exclusive jurisdiction" over captioning issues concerning streaming video content. 47 C.F.R. § 79.4(f) (new); (Report and Order ¶ 77 & n.310). These provisions offer, among other things, persuasive evidence that Congress intended the CVAA and regulations as the comprehensive statutory captioning scheme, and did not intend to allow Plaintiffs to use inconsistent interpretations of ADA or other statutes as an end-run around the regulation. Plaintiffs' view would impermissibly contort the ADA into parallel regulatory scheme that competes and conflicts with the specific and more recent CVAA and regulations.[3] Further, Plaintiffs above misplace reliance on the DOJ's citation to a "savings clause" included in "historical and statutory notes" of the Telecommunications Act of 1996. (*See* ECF No. 24 at 9, *citing* Pub. L. No. 104-104, § 601(c)(1) (reprinted in 47 U.S.C. § 152, historical and statutory notes.) The CVAA does not incorporate that clause or those historical notes.

---

[3] In addition, these provisions invalidate the DOJ's argument that the "exclusive jurisdiction" term is not relevant to the CVAA or streaming video content. (*See, e.g.*, ECF No. 24, DOJ Stmt. of Int., at 9.) (Plaintiffs note that they do not understand DOJ to have made such an argument.)

12

*Second*, the regulations place primary responsibility for captioning on video content owners (*e.g.*, movie studios) — *not* distributors like Netflix — because they are "farther up in the distribution chain," and, as such, "will be better positioned than [Netflix] to obtain the necessary rights and information and fulfill the responsibilities that we impose on [owners], in particular providing captions, pursuant to our regulations."  (Report and Order ¶ 24.)  In turn, distributors like Netflix would "pass-through" captions provided by owners.  (*Id.* ¶ 26.)  Plaintiffs' interpretation of the ADA turns the FCC's regulatory approach on its head.  Plaintiffs would make *a distributor* entirely responsible for captioning streaming content — copyright, technical, distribution chain, practical difficulties, and the FCC's findings notwithstanding.   Although Plaintiffs say an "undue burden" analysis would mitigate the impact of Plaintiffs' ADA claims, the relief Plaintiffs seek — a broad request for Netflix to "provide effective communication through closed captioning" (ECF No. 19, Prayer for Relief, ¶ 2) — accounts for neither the CVAA's allocation of the burden to owners, nor the difficulty Netflix would encounter in complying with Plaintiffs' requested relief.

*Third*, to protect certain practices and entities from liability, the FCC Regulations provide categorical "safe-harbors" — mandatory situations in which entities are expressly "*protected from liability*," including where distributors make "good faith efforts" to caption their content or employ industry standards for captioning content. (Report and Order ¶¶ 16, 124 (emphasis added).)  But while the FCC regulations would explicitly "protect[] from liability" Netflix for its "good faith efforts" to ensure content is captioned and compliance with industry standards, Plaintiffs' view of the ADA would have the directly inconsistent effect of *imposing* liability for exactly the same conduct.

*Fourth*, the FCC regulations articulate uniform technical standards by which providers can caption streaming content, which standards provide national predictability in the industry and ensure deaf and hard-of-hearing consumers enjoy reliable and consistent captions. (Report and Order ¶¶ 33–39, 124–126.) By asserting its ADA claim, however, Plaintiffs encourage others to file a patchwork of claims in courts throughout the country that would undermine the uniformity that the regulations aim to provide.

*Fifth*, the regulations provide for a two-year grace period and schedule of "compliance deadlines" during which owners and distributors would adapt to the regulations. (Report and Order ¶¶ 51–60; *see id.* ¶ 34 ("[owners] and [distributors] must be provided with a reasonable period of time to develop processes or methods" for captioning streaming content because of the "costs and complexities" currently associated with captioning).) Plaintiffs, however, request *immediate* captioning of *all* digital content, regardless of these timelines. In addition, Plaintiffs focus on "live and near-live programming," but do not address the CVAA's and regulations' timelines for "archival IP-delivered" programming, which comprises the majority of video content. (*Id.* at ¶ 33–34.) These timelines permit owners and distributors sufficient opportunity to caption older content that may not come already captioned. (*Id.*)

*Sixth*, the regulations confirm that the CVAA "cover *any* programming delivered to consumers using IP" (Report and Order ¶ 35, emphasis added)—*not*, as Plaintiffs and the DOJ argued, only content that exists "after" the effective date of the regulations. (ECF No. 24, DOJ Stmt. of Int., at 13; Pls.' Opp'n, at 5–6.) Indeed, the FCC expressly rejected Plaintiffs' and DOJ's position, which was shared by commenters during the notice-and-comment period.

> Some commenters maintain that the statute does not cover content delivered to the [distributors] and posted online prior to the effective date of the regulation, seemingly reading the term "delievered" in Section 202(b) to refer to the time of the VPO's

> delivery of content to the VPD rather than the time of publication
> or exhibition on television with captions. . . . *We interpret Section
> 202(b) to cover any programming delivered to consumers using IP*,
> provided that the programming was published or exhibited on
> television with captions after the effective date of the regulations.
> We believe that this interpretation is consistent with the language,
> history, and purpose of the statute.

(Report and Order ¶ 35 (emphasis added).)  Thus, if any video programming content has been or

will have been displayed on television with captions, it comes within the broad scope of the

CVAA.  Plaintiffs' novel interpretation of the ADA would impose overlapping and conflicting

schemes over the same type of streaming content.

In Netflix's view, none of these issues requires discovery.

For these reasons, Netflix respectfully requests the opportunity to file a motion for

judgment on the pleadings before Plaintiffs engage in discovery.  If the Court determines that

Plaintiffs' claim survives notwithstanding the regulations, it should then consider to what extent

the regulations circumscribe discovery, the relief Plaintiffs seek, and the like.

## III.  THE PARTIES' PROPOSED DISCOVERY AND LITIGATION SCHEDULES.

In light of their different interpretations of the FCC's Report & Order, the Parties also

have different proposals as to the future conduct of this litigation.

### A.   Plaintiffs' Position

Plaintiffs believe the case should proceed to discovery before dispositive motions are

addressed, consistent with the Joint Report Under Rule of Civil Procedure 26(f) and Joint

Statement Under Local Rule 16.1(d) previously submitted by the Parties, with the dates adjusted

to take into account the delay caused by Netflix's Motion to Dismiss and the stays of the

litigation.  (*See* ECF No. 27.)

In crafting the short, initial stay at the hearing on Netflix's Motion to Dismiss, the Court recognized that Plaintiffs desire a "prompt resolution of this case," noting that Plaintiffs believe "their rights . . . are being violated and they want those violations to be stopped as soon as possible." (Tr. at 42:21-25.)  Every day, Plaintiffs and other members of the deaf and hard of hearing community are denied full and equal access to the streaming content of Netflix. Plaintiffs are harmed by this exclusion, and wish to press forward with the resolution of this case and obtain a determination of their rights as soon as possible.

As set forth above, Plaintiffs believe that the CVAA and its implementing regulations do not affect the central issue in this case, and certainly in no way entitles Netflix to judgment on the pleadings.   Rather, it is relevant to background context which may be helpful in shaping discovery and may become useful at the remedies stage.   Therefore, Plaintiffs plan to serve discovery as soon as practicable.  Plaintiffs believe that discovery is appropriate to begin while any Motion for the Judgment on the Pleadings is underway, and reserve the right to offer further briefing as to why if necessary.  Plaintiffs also believe that the Parties (and the Court, if necessary), will best be able to resolve any issues as to the scope and timing of discovery once specific discovery requests have been served, rather than deciding now in the abstract as Netflix proposes.

Plaintiffs therefore propose the following schedule:

| Motion for Judgment on the Pleadings | April 2, 2012 |
|---|---|
| Opposition[4] | April 23, 2012 |
| Hearing re MJOP; | May 14, 2012, or as soon thereafter |

---

[4] Netflix seeks a reply to its motion for judgment on the pleadings. Plaintiffs are not willing to agree in the abstract to Netflix's having a reply, but will not object unreasonably if a reply seems warranted.

| Status Conference (if necessary) | as the matter may be heard |
|---|---|
| Fact Discovery Cut-off (assuming no stay is imposed) | August 20, 2012 |
| Expert Disclosures and Initial Reports | October 22, 2012 |
| Expert Rebuttal Reports | November 5, 2012 |
| Expert Depositions | November 16, 2012 |
| Last Day for any Dispositive Motions | December 21, 2012 |
| Evidence / Expert Exclusion Motions | December 21, 2012 |
| Trial | February 4, 2013 |

### B.    Netflix's Position

Netflix believes the Court should enter a briefing schedule that allows for pre-discovery briefing on a motion for judgment on the pleadings that addresses the now-promulgated regulations—including the opportunity for a reply, which Plaintiffs have not included in their proposal but Netflix believes necessary given the apparent complexity of and disagreements regarding these issues.  Netflix proposes that a discovery conference should be scheduled for the same day:  if the Court grants Netflix's motion, the discovery conference becomes moot; if the Court denies the motion, it can address how the regulations would narrow discovery and the remainder of the case.  Thereafter, the case would proceed on a schedule that accounts for the stay that Plaintiffs and Netflix jointly requested.

Accordingly, Netflix proposes the following schedule:

| Motion for Judgment on the Pleadings | April 16, 2012 |
|---|---|
| Opposition | May 7, 2012 |
| Reply | May 21, 2012 |
| Hearing re MJOP; | May 29, 2012[5] |

---

[5] May 28 is Memorial Day.

| | |
|---|---|
| *Status Conference re Opening Discovery, etc. (if necessary)* | |
| *Fact Discovery Cut-off* | **August 20, 2012** |
| *Expert Disclosures and Initial Reports* | **October 22, 2012** |
| *Expert Rebuttal Reports* | **November 5, 2012** |
| *Expert Depositions* | **November 16, 2012** |
| *Dispositive Motions* | **December 21, 2012** |
| *Evidence / Expert Exclusion Motions* | **December 21, 2012** |
| *Trial* | **February 4, 2013** |

Dated: March 15, 2012　　　　ATTORNEYS FOR PLAINTIFFS

Respectfully Submitted,_____　By: _____ */s/ Catha Worthman*

　　　　　　　　　　　　　　Bill Lann Lee, *pro hac vice*
　　　　　　　　　　　　　　Brad Seligman, *pro hac vice*
　　　　　　　　　　　　　　Catha Worthman, *pro hac vice*
　　　　　　　　　　　　　　Joshua Davidson, *pro hac vice*
　　　　　　　　　　　　　　LEWIS, FEINBERG, LEE, RENAKER &
　　　　　　　　　　　　　　JACKSON, P.C.
　　　　　　　　　　　　　　476 9th Street
　　　　　　　　　　　　　　Oakland, CA  94607-4048
　　　　　　　　　　　　　　Telephone: (510) 839-6824
　　　　　　　　　　　　　　bseligman@lewisfeinberg.com
　　　　　　　　　　　　　　blee@lewisfeinberg.com
　　　　　　　　　　　　　　cworthman@lewisfeinberg.com
　　　　　　　　　　　　　　jdavidson@lewisfeinberg.com

　　　　　　　　　　　　　　Arlene Mayerson
　　　　　　　　　　　　　　Charlotte Lanvers
　　　　　　　　　　　　　　Shira Wakschlag
　　　　　　　　　　　　　　DISABILITY RIGHTS EDUCATION
　　　　　　　　　　　　　　AND DEFENSE
　　　　　　　　　　　　　　FUND, INC.
　　　　　　　　　　　　　　3075 Adeline Street, Suite 210
　　　　　　　　　　　　　　Berkeley, CA 94703
　　　　　　　　　　　　　　Telephone: (510) 644-2555
　　　　　　　　　　　　　　amayerson@dredf.org
　　　　　　　　　　　　　　clanvers@dredf.org
　　　　　　　　　　　　　　swakschlag@dredf.org

　　　　　　　　　　　　　　Christine M. Netski, BBO #546936
　　　　　　　　　　　　　　SUGARMAN, ROGERS, BARSHAK &
　　　　　　　　　　　　　　COHEN, P.C.
　　　　　　　　　　　　　　101 Merrimac Street
　　　　　　　　　　　　　　Boston, MA 02114-4737
　　　　　　　　　　　　　　Telephone: (617) 227-3030
　　　　　　　　　　　　　　netski@srbc.com

　　　　　　NETFLIX, INC., by its counsel,

　　　　　　By: _____ /s/ David F. McDowell _____

　　　　　　　　　　　　　　MORRISON & FOERSTER LLP
　　　　　　　　　　　　　　David F. McDowell, *pro hac vice*
　　　　　　　　　　　　　　Jacob M. Harper, *pro hac vice*
　　　　　　　　　　　　　　555 West Fifth Street, Suite 3500
　　　　　　　　　　　　　　Los Angeles, California  90013-1024
　　　　　　　　　　　　　　Telephone:　213-892-5200
　　　　　　　　　　　　　　Facsimile:　213-892-5454
　　　　　　　　　　　　　　　　dmcdowell@mofo.com;
　　　　　　　　　　　　　　　　jacobharper@mofo.com

## PLAINTIFFS' [PROPOSED] ORDER

For good cause shown, the Court hereby sets the following schedule for further litigation of this action:

| | |
|---|---|
| *Motion for Judgment on the Pleadings* | **April 2, 2012** |
| *Opposition* | **April 23, 2012** |
| *Hearing re MJOP; Status Conference (if necessary)* | **May 14, 2012** |
| *Fact Discovery Cut-off (assuming no stay is imposed)* | **August 20, 2012** |
| *Expert Disclosures and Initial Reports Due* | **October 22, 2012** |
| *Expert Rebuttal Reports Due* | **November 5, 2012** |
| *Last Day to Complete Expert Depositions* | **November 16, 2012** |
| *Last Day for any Dispositive Motions* | **December 21, 2012** |
| *Last Day for Evidentiary and Expert Exclusion Motions* | **December 21, 2012** |
| *Trial* | **February 4, 2013** |

IT IS SO ORDERED.

_____

Judge Michael A. Ponsor

## NETFLIX'S [PROPOSED] ORDER

For good cause shown, and according to the schedule below, the Court will allow Netflix to file a motion for judgment on the pleadings, with a discovery conference set for the same day as the hearing on Netflix's motion.  If the case is not resolved at or before the discovery conference, Plaintiffs may serve discovery according to any order entered at such conference. Discovery will be stayed until that hearing.

| | |
|---|---|
| *Motion for Judgment on the Pleadings* | **April 16, 2012** |
| *Opposition* | **May 7, 2012** |
| *Reply* | **May 21, 2012** |
| *Hearing re MJOP; Status Conference re Opening Discovery, etc. (if necessary)* | **May 29, 2012** |
| *Fact Discovery Cut-off* | **August 20, 2012** |
| *Expert Disclosures and Initial Reports* | **October 22, 2012** |
| *Expert Rebuttal Reports* | **November 5, 2012** |
| *Expert Depositions* | **November 16, 2012** |
| *Dispositive Motions* | **December 21, 2012** |
| *Evidence / Expert Exclusion Motions* | **December 21, 2012** |
| *Trial* | **February 4, 2013** |

IT IS SO ORDERED.

_____
Judge Michael A. Ponsor

21