**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| _____ | ) | |
| NATIONAL ASSOCIATION OF THE DEAF, | ) | |
| WESTERN MASSACHUSETTS ASSOCIATION | ) | |
| OF THE DEAF AND HEARING IMPAIRED, | ) | |
| and LEE NETTLES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:11-cv-30168 |
| | ) | |
| NETFLIX, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS</u>

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517 because this litigation implicates the interpretation and application of title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq., and its implementing regulation.[1] Plaintiffs, an individual who is deaf and two advocacy organizations serving the interests of persons who are deaf or hard of hearing, allege that Netflix has violated the ADA by failing to provide closed captioning on the vast majority of the movie and television titles offered on its "Watch Instantly" on-demand streaming video service, as well as equal access to other services offered to Netflix members (such as Netflix "recommendations" and genre-sorted movie listings). See First Am. Compl. for Declaratory and Injunctive Relief ¶¶ 1-6, 47-56 (Aug. 9, 2011) (Docket # 19) ("FAC").

Congress' purpose in enacting the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), having found that "discrimination against individuals with disabilities persists in such critical areas as . . . recreation . . ." and that "many people with physical or mental disabilities have been precluded from [fully participating in all aspects of society]." 42 U.S.C. § 12101(a)(3) and (1). To remedy such discrimination, the ADA prohibits a public accommodation, such as Netflix, from denying individuals who are deaf or hard of hearing the "full and equal enjoyment of [its] goods, services, facilities, privileges, advantages, or accommodations…." 42 U.S.C. § 12182(a). Streaming of video programming over the Internet—by defendant Netflix and other similar providers— has revolutionized the entertainment industry; it is fast becoming the dominant means of delivering movies, television shows, and other entertainment offerings to the American public. Persons who are

---

[1]     Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any . . . district in the United States to attend to the interests of the United States in a suit pending in a court of the United States[.]"  The Department of Justice ("Department" or "DOJ"), moreover, is the federal agency with primary responsibility for enforcing title III of the ADA and its implementing regulations.  See 42 U.S.C. §§ 12186(b), 12188(b); 28 C.F.R. pt. 36.

deaf or hard of hearing should not be prevented from fully participating in this aspect of American life.  Netflix's denial of equal access to, and full enjoyment of, its "Watch Instantly" service violates the ADA.  Defendant's claims that the ADA does not apply to its "Watch Instantly" service and is preempted by the Twenty-First Century Communications and Video Accessibility Act of 2010 ("CVAA"), Pub. L. No. 111-260, 124 Stat. 2751 (Oct. 8, 2010), are incorrect.  Accordingly, the United States has a strong interest in the resolution of this matter and respectfully requests that this Court deny Defendant Netflix's Motion for Judgment on the Pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.

## STATUTORY AND REGULATORY BACKGROUND

The history behind the Twenty-First Century Communications and Video Accessibility Act of 2010 ("CVAA") was recited in the United States' Statement of Interest in Opposition to Defendant's Motion to Dismiss the First Amended Complaint (filed Oct. 3, 2011) (Docket #24) and need not be repeated fully here.  In short, in 1996, Congress enacted the Telecommunications Act of 1996, Pub. L. No. 104-104, § 713, 110 Stat. 126 (1996) (codified at 47 U.S.C. § 613), requiring for the first time closed captioning of television programs.  Previously, the television industry had voluntarily provided some television captioning.  In 2010, Congress passed the CVAA in order to update federal communications law and "to help ensure that individuals with disabilities are able to fully utilize communications services and equipment and better access video programming."  See S. Rep. No. 111-386, at 1- 4 (2010); H. Rep. No. 111-563, at 19-20 (2010).  While the CVAA addresses a range of communication technology and devices, at issue in this case are the provisions relating to closed captioning of video programming (i.e., television programming) delivered using Internet protocol. Specifically, Section 202 of the CVAA requires the Federal Communications Commission ("FCC")


to promulgate regulations "to require the provision of closed captioning on video programming delivered using Internet protocol that was published or exhibited on television with captions after the effective date of such regulations." See CVAA § 202(b) (codified at 47 U.S.C. § 613(c)(2)(A)).  The FCC published its regulations through a Final Report and Order released January 13, 2012 (Def.'s Ex. B), as summarized in a Final Rule published in the Federal Register on March 30, 2012.  Closed Captioning of Internet Protocol-Delivered Video Programming:  Implementation of the Twenty-First Century Communications and Video Accessibility Act of 2010, Report and Order, FCC 12-9 (Jan. 13, 2012) ("FCC 12-9"), summarized and pub'd at 77 Fed. Reg. 19480-01, 2012 WL 1048800 (Mar. 30, 2012), codified at 47 CFR Pts. 15 and 79.

Despite Defendant's misrepresentations,[2] both the CVAA and the FCC's implementing regulations make absolutely clear that the CVAA requires closed captioning of certain video programming that is streamed on the Internet only if it was exhibited on TV with captions after the effective date of the regulations.  See CVAA § 202(b) (codified at 47 U.S.C. § 613(c)(2)(A)); 47 C.F.R. § 79.4(b).  While the regulations published in the Federal Register on March 30, 2012 take effect on April 30, 2012, the regulations establish compliance deadlines for captioning of streamed video programming ranging from 6 to 24 months after April 30, 2012.  47 C.F.R. § 79.4(b).  Such programming must be captioned if the programming is exhibited on television in the United States with captions on or after the following dates:  (1) September 30, 2012, for prerecorded programming that is not substantially edited for Internet distribution; (2) March 30, 2013 for live and near-live programming; and (3) September 30, 2013 for prerecorded programming that is substantially edited

---

[2]  Defendant states that "The CVAA applies to all streaming video programming produced at any time, including anything that will have been exhibited on television 'prior to' or 'after' the effective date," citing to CVAA § 202(b), codified at 47 U.S.C. § 613(c).  See Def.'s Mot. for J. on the Pleadings, Mem. of Points and Authorities at 16 ("Def.'s Mem.").  In fact, the "prior to" language does not exist in § 202(b), which only governs programming exhibited on television after the effective date.

for Internet distribution.  Id.  However, these dates do not apply if the programming was already in the video programming distributor's library.  If this is the case, then such programming must be captioned within certain time frames only if it is shown on television with captions on or after March 30, 2014.  Id.  Consequently, the CVAA requires streamed Internet programs to be captioned, at the earliest, on September 30, 2012.  The CVAA does not require programming shown on television before September 30, 2012 to be captioned when streamed on the Internet, unless and until the programming is shown again on television on or after September 30, 2012.

## ARGUMENT

Defendant Netflix is a public accommodation that offers its Watch Instantly and other services to the public.  As such, Netflix is subject to title III of the ADA, even if it has no physical structure.  Netflix falls within the twelve enumerated categories of public accommodations, and Congress, when passing the ADA in 1990, intended to cover advances in technology, such as the advent of the Internet.  Further, the Department of Justice ("DOJ" or the "Department") has long interpreted title III to apply to web services, and DOJ's ongoing regulatory developments concerning the accessibility of web content and services support that Netflix is a public accommodation subject to title III of the ADA.  Netflix clearly owns and operates its Watch Instantly service, and thus its alleged lack of control over captioning does not undermine Netflix's coverage as a public accommodation.  Finally, the CVAA does not preempt the ADA or conflict with its application to this case.

**A.**     **Netflix's Web-Only Service is a Public Accommodation Subject to Title III**

1.     Carparts Held That Public Accommodations are Not Limited to Physical Structures

Netflix, which operates its website and Watch Instantly service through computer servers and

the Internet, is a public accommodation subject to title III of the ADA, even if it has no physical

structure where customers come to access its services.  In Carparts Distribution Center, Inc. v.

Automotive Wholesaler's Association of New England, Inc., 37 F.3d 12 (1st Cir. 1994), the First

Circuit held that a public accommodation under title III of the ADA is not limited to physical

structures. 37 F.3d at 19.  The Court specifically analyzed a "travel service," which is identified in

the statute as a public accommodation, and concluded that Congress clearly intended to "include

providers of services which do not require a person to physically enter an actual physical structure."

Id.  The Court also found that its conclusion was consistent with the legislative history of the ADA,

given "Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges

and advantages, available indiscriminately to other members of the general public."  Id. at 19, 20.

Defendant's discussion of Carparts in support of its assertion that it is not a public

accommodation is inaccurate and misleading.  Defendant argues that Carparts "came to the narrow

conclusion that a place of public accommodation 'might, in some circumstances,' include things that

are not 'actual, physical structures.'"  Def.'s Mem. at 10.  First, the qualifying language that

Defendant attributes to the case – "might, in some circumstances" – does not appear in the decision.

Second, Defendant misleads by claiming that subsequent First Circuit and District Court cases have

failed to follow Carparts, conveniently ignoring that those subsequent cases had nothing to do with

the issue at hand.  Def.'s Mem. at 10, citing to Barton v. Clancy, 632 F.3d 9, 19 (1st Cir. 2011)

(considering whether an entity would be an employer under the ADA if it exercised control over an

important aspect of the plaintiff's employment); <u>Lopez v. Massachusetts</u>, 588 F.3d 69, 88 (1st Cir. 2009) (same); and <u>Iwata v. Intel Corp.</u>, 349 F.Supp.2d 135, 144 n. 3 (D. Mass. 2004) (stating, in a title I and ERISA action, that title III might apply to health benefit plans).[3]

Although the First Circuit has not addressed specifically whether an entity like Netflix, which provides a subscription video service via its website, is a public accommodation, the analysis in <u>Carparts</u> clearly compels such a result.  Under the <u>Carparts</u> analysis, a web-based service like Netflix, whose customers pay for a video service through its website but has no physical structure for customers to enter, should be considered a public accommodation just like a travel service that has no physical structure for customers to enter, but conducts business by telephone.  As the First Circuit said in <u>Carparts</u>, "Congress could not have intended such an absurd result" as to cover services offered at a store, but not those same services offered through the telephone, or likewise, the Internet. <u>Carparts</u>, 37 F.3d at 19; <u>see also</u> <u>Doe v. Mutual of Omaha Ins. Co.</u>, 179 F.3d 557, 559 (7th Cir. 1999) ("The core meaning of [title III's nondiscrimination provision, 42 U.S.C. § 12182(a)], plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space) that is open to the public cannot exclude disabled persons . . .") (internal citation omitted); <u>Morgan v. Joint Admin. Bd., Ret. Plan of the Pillsbury Co.</u>, 268 F.3d 456, 459 (7th Cir. 2001) (rejecting that public accommodation must be a physical site).[4]

---

[3]  In fact, First Circuit and District Courts have cited approvingly to <u>Carparts</u>' holding that a public accommodation need not have a physical structure.  <u>See</u> <u>Tompkins v. United Health Care of New England</u>, 203 F.3d 90, 95 n.4 (1st Cir. 2000); <u>Fletcher v. Tufts Univ.</u>, 367 F. Supp. 2d 99, 115 (D. Mass. 2005); <u>Conners v. Maine Med. Ctr.</u>, 42 F. Supp. 2d 34, 46 (D. Me. 1999); <u>Boots v. Northwestern Mutual Life Ins.</u>, 77 F. Supp. 2d 211, 215 (D.N.H. 1999); <u>Doukas v. Metropolitan Life Ins. Co.</u>, 950 F. Supp. 422, 425-27 (D.N.H. 1996).

[4]  While some courts in other circuits have held that title III does not apply to web-only services, this conclusion does not comport with the First Circuit's ruling in <u>Carparts</u>, the ADA's legislative history, or the Department of Justice's interpretation of title III.  <u>See</u> <u>Access Now, Inc. v. Southwest Airlines, Co.</u>, 227 F. Supp. 2d 1312 (S.D. Fla. 2002) (finding a Website is only covered if it affects access to a physical place of public accommodation); <u>see also Weyer v.</u>

2.      Netflix's Watch Instantly Service Falls Within the Enumerated Categories of Public Accommodations

Title III and its implementing regulation enumerate 12 categories of private entities whose operations affect commerce that are considered public accommodations.  42 U.S.C. § 12181(7); 28 C.F.R. § 36.104.  Netflix's Watch Instantly service falls within at least one, if not more, of these categories, as a "service establishment," 42 U.S.C. § 12181(7)(F) (including travel service, shoe repair service, etc.), as a "place of exhibition or entertainment," 42 U.S.C. § 12181(7)(C) (including motion picture house, theater, etc), and/or as a "sales or rental establishment," 42 U.S.C. § 12181 (7)(E) (including grocery store, shopping center, etc.).  See also 28 C.F.R. § 36.104.

Like a travel service that has no physical structure open to the public, Netflix is a "service establishment" that enables customers to instantly stream a wide variety of programming via its website wherever they have an Internet connection.  Netflix also falls into the "exhibition or entertainment" category as its service displays movies, television programs, and other entertainment content.  Finally, Netflix is also a "rental establishment" because its customers are paying for the rental of video programming via its website.

The absence of web-based services as a specific example in these categories is not surprising – when Congress enacted the ADA in 1990, the World Wide Web had not yet been invented.  See Pub. L. No. 101-336, 104 Stat. 327 (ADA passed on July 26, 1990); Nerds 2.0.1 Timeline: 1990-1998, PBS (1998) http://www.pbs.org/opb/nerds2.0.1/timeline/90s.html (World Wide Web released in 1991).  Further, such absence does not mean that such services aren't included. Congress intended that the statute not be limited to the specific examples listed in each category.  The House Report

---

Twentieth Century Fox Film Corp., 198 F.3d 1104, 1114-16 (9th Cir. 2000) (requiring some connection between the goods or services complained of and an actual physical place); Ford v. Schering-Plough Corp., 145 F.3d 601, 612-13 (3d Cir. 1998) (finding no nexus between challenged insurance policy and services offered to the public from insurance office).

explains that the list of examples in the definition of "public accommodations" is not meant to be a

limitation on the more general catchall categories:

> A person alleging discrimination does not have to prove that the entity being charged with discrimination is similar to the examples listed in the definition. Rather, the person must show that the entity falls within the overall category. For example, it is not necessary to show that a jewelry store is like a clothing store. It is sufficient that the jewelry store sells items to the public.

H.R. Rep. No. 485, pt. 3, at 54 (1990). The Senate Report similarly states that

> within each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase "other similar" entities. The Committee intends that the "other similar" terminology should be construed liberally consistent with the intent of the legislation that people with disabilities should have equal access to the array of establishments that are available to others who do not currently have disabilities.

S. Rep. No. 116, at 59 (1989).

Importantly, Congress intended to include public accommodations that take advantage of new

technology. The House Committee on Education and Labor stated that it intended "that the types of

accommodation and services provided to individuals with disabilities, under all of the titles of this

bill, should keep pace with the rapidly changing technology of the times[,]" and that technological

advances "may require public accommodations to provide auxiliary aids and services in the future

which today would not be required because they would be held to impose undue burdens on such

entities." H.R. Rep. No. 485, pt. 2, at 108 (1990). Indeed, the statute cannot be, and has not been,

limited by what Congress envisioned at the time of enactment. See, e.g., Pennsylvania Dep't of

Corrections v. Yeskey, 524 U.S. 206, 211 (1998) (ruling that ADA applies to prisons, even if

"Congress did not envision that the ADA would be applied to state prisoners") (citation and internal

punctuation omitted); cf., Oncale v. Sundowner, 523 U.S. 75, 79 (1998) (holding that same-sex

sexual harassment was actionable under Title VII, even if Congress did not contemplate same-sex

sexual harassment when it enacted the Civil Rights Act of 1964 because "statutory prohibitions often

go beyond the principal evil to cover reasonably comparable evils"); Dean v. Ashling, 409 F.2d 754,

755 (5th Cir. 1969) (ruling that title II of the Civil Rights Act of 1964 applies to rental space in a

trailer park, even though "[n]othing in the legislative history suggests that anyone considered trailer

parks").

       3.     <u>The Department of Justice's Regulatory Developments Reinforce that Netflix is a Public Accommodation</u>

Contrary to Defendant's unsupported assertions, the Department's ongoing regulatory

developments support that Netflix is a public accommodation subject to title III of the ADA.  The

Department is currently developing regulations specifically addressing the accessibility of goods and

services offered via the web by entities covered by the ADA.  The fact that the regulatory process is

not yet complete in no way indicates that web services are not already covered by title III.

Title III regulations have always required that public accommodations provide effective

communication to persons with disabilities through the provision of auxiliary aids and services,

including, where appropriate, captioning.  28 C.F.R. § 36.303(b)(1), 28 C.F.R. Part 36, App. C,

§ 36.303; <u>see also Arizona v. Harkins Amusement Enterprises, Inc.</u>, 603 F.3d 666, 675 (9th Cir. 2010)

(holding that the ADA required a chain of movie theaters to exhibit movies with closed captioning

and video description unless the theaters could show that to do so would amount to a fundamental

alteration or undue burden); Agreement Between the United States of America and Walt Disney

World Co. Under the Americans With Disabilities Act Concerning the Use of Auxiliary Aids at Walt

Disney World (January 17, 1997), available at <u>http://www.ada.gov//disagree.htm</u> (requiring Walt

Disney World to provide auxiliary aids and services necessary for deaf and hard of hearing

individuals to enjoy the programs and services at Walt Disney World Resort, including captioning, sign language interpreters, assistive listening systems, and written aids).

In addition, the Department has long affirmed the application of title III of the ADA to websites of public accommodations, and the Department's views on title III are entitled to deference. Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984).  The Department first made this position public in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to individuals with visual disabilities.  See Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), available at http://www.justice.gov/crt/foia/readingroom/frequent_requests/ada_tal/tal712.txt.  In 2000, the Department filed an amicus brief in the Fifth Circuit in Hooks v. OKbridge, Inc., 232 F. 3d 208 (5th Cir. 2000) which involved a web-only business.  The Department's brief explained that a business providing services solely over the Internet is subject to title III's prohibitions on discrimination on the basis of disability.  See Brief of the United States as Amicus Curiae in Support of Appellant, (No. 99-50891), 1999 WL 33806215, available at http://www.justice.gov/crt/about/app/briefs/hooks.pdf.

Contrary to Defendant's assertion, DOJ has not "declined to adopt" regulations regarding web accessibility.  Def's. Mem. at 12.  Rather, DOJ is engaged in an ongoing regulatory process, and the regulatory proposal currently being considered by the Department supports the long-standing coverage of websites.  In 2008, the Department issued a Notice of Proposed Rulemaking ("NPRM") to adopt the new ADA Accessibility Guidelines published by the U.S. Access Board and to update the title III regulation on such topics as safe harbor for barrier removal, service animals, equipment and furniture, wheelchairs and other power-driven mobility devices, and auxiliary aids and services,

10

among others.  Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 73 Fed. Reg. 34508, 34514-19 (June 17, 2008).  The NPRM explained that the Department was considering options for requiring movie theater owners and operators to exhibit movies that are captioned, explaining that "both open and closed captioning are examples of auxiliary aids and services under the Department's regulation, 28 CFR § 36.303(b)(1)," and that closed captioning technology did not yet exist at the time the ADA was enacted for first run movies in theaters.  Id. at 34530.  The NPRM sought comments on movie captioning but did not propose regulatory language.  The Department received numerous comments urging the Department to issue captioning and video description regulations. The Department promulgated a Final Rule revising the title III regulations on September 15, 2010, which did not include specific regulations governing movie captioning beyond the general effective communication requirements.  Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56236 (Sept. 15, 2010).

On July 26, 2010, the Department issued an Advanced Notice of Proposed Rulemaking ("ANPRM") on Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations.  75 Fed Reg. 43460.  The Department explained in the ANPRM that although the Department has been clear that the ADA applies to websites of public accommodations, inconsistent court decisions, differing standards for determining web accessibility, and repeated calls for Department action warranted further guidance.  Id. at 43464.  Through the ANPRM, the Department sought to explore what regulatory provisions it could propose to make clear to entities covered by the ADA their obligations to make their websites accessible —including captioning of videos—and what specific requirements could be adopted to provide the disability

11

community consistent access to websites and covered entities clear guidance on what is required under the ADA.  Id. at 43464, 43467 Question 15.  The Department asked for comments on what website accessibility standards should be used, any coverage limitations, and compliance dates, among other issues.

The comment period was open for 180 days after publication in the Federal Register on July 26, 2010.  In response to the ANPRM, the Department received approximately 440 public comments and is reviewing these comments.  See Office of Information and Regulatory Affairs, Office of Management and Budget, Reginfo.gov, Unified Agenda, Fall 2011 Agency Statements of Regulatory Priorities (Department of Justice), available at

http://www.reginfo.gov/public/jsp/eAgenda/StaticContent/201110/Statement_1100.html.  After reviewing the comments, the Department may issue an NPRM, receive comments, and issue a Final Rule.

While the regulatory process may not have proceeded as quickly as Defendant expects, it is still very much ongoing, as confirmed by the DOJ Fall 2011 Unified Agenda (DOJ's statement to the Office of Management and Budget of its regulatory agenda).  The fact that that the regulatory process is not yet complete does not support any inference whatsoever that web-based services are not already covered by the ADA, or should not be covered by the ADA.[5]

---

[5]  Defendant also is incorrect that "Congress has also declined to update the statute to include websites and video programming . . . despite making several amendments to the ADA since 1990."  Def.'s Mem. at 13.  In reality, the ADA has been amended by Congress only once, in 2008, through the ADA Amendments Act ("ADAAA"), Pub. L. 110-325 (Sept. 25, 2008).  The purpose of the ADAAA was to clarify Congress' intent to broadly cover individuals with disabilities, and to supersede court decisions that had too narrowly interpreted the ADA's disability definition.  ADAAA, Sec. 2 Findings and Purposes.  It is unreasonable to draw any conclusion about whether a web-based service is or is not a public accommodation from the enactment of the ADAAA.

**B.**      **Defendant is Covered Under Title III Because it Owns and Operates its Watch Instantly Service; Other Control Arguments Are Not Supported or Are Inappropriate for Judgment on the Pleadings**

For title III to apply, a defendant must be a "person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182. There is no dispute that Defendant owns and operates its business, including the Watch Instantly service, which provides video programming to customers via its website. FAC ¶ 13; Answer of Def. to First Am. Compl. ¶ 13 (Dec. 8, 2011) (Docket #34). Defendant also controls what video programming it offers to customers through its website, and how that programming is prepared and formatted to make it available through Internet streaming. Accordingly, Defendant exerts sufficient ownership and control of a public accommodation to be covered under the ADA.

Defendant attempts to argue that it lacks control over the ability to caption its video programming, and thus it has not violated the ADA because it does not "own[], lease[] (or lease[] to), or operate[] a place of public accommodation," 42 U.S.C. § 12182(a). Def.'s Mem. at 6. Control over captioning, however, does not undermine Defendant's coverage as a public accommodation, and the cases to which Defendant cites support the proposition that Netflix is covered under the ADA as an owner and operator of its website and Watch Instantly service. Each of the cases cited by Defendant involve a court trying to determine which one of multiple, intertwined entities actually operated the place of public accommodation at issue in order to determine responsibility under the ADA. See Neff. v. American Dairy Queen Corp., 58 F.3d 1063, 1066-68 (5th Cir. 1995) (affirming grant of summary judgment, ruling that Dairy Queen franchisor did not own or operate the franchisee restaurant in a suit alleging ADA architectural violations because under the franchise agreement it had almost no control over architectural issues, thereby making the franchisee the operator of the

establishment and proper defendant); <u>Pickern v. Pier 1 Imps. Inc.</u>, 457 F.3d 963, 965-67 (9th Cir.

2006) (affirming grant of summary judgment, ruling that Pier 1 store was not liable for installing a

ramp across a City-owned grassy strip between the store and the City-owned sidewalk because it did

not own, operate or control the grassy strip.); <u>Guckenberger v. Boston Univ.</u>, 957 F.Supp. 306, 321-

23 (D. Mass. 1997) (on motion to dismiss, holding a former president who is the current chancellor of

a university liable under title III as an operator of the university, but finding another official not to

have sufficient control to be liable as an operator; the University was the primary defendant);

<u>Coddington v. Adelphi Univ.</u>, 45 F.Supp.2d 211, 217 (E.D.N.Y. 1999) (on motion to dismiss, finding

no individual liability for president and other officials of a university but finding the university to be

the proper defendant under title III); <u>Cortez v. Nat'l Basketball Ass'n</u>, 960 F. Supp. 113, 115-17

(W.D. Tex. 1997) (on motion to dismiss, ruling that the NBA does not own, operate, or lease the

Alamodome so it cannot be liable under title III).  There is no dispute that Netflix owns and operates

its website and Watch Instantly service.  Thus, there is no need to examine the issue of control for

purposes of title III's application.

Furthermore, Netflix is confusing coverage as a public accommodation under title III with

liability under title III.  On a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), the

court must accept the non-movant's well-pleaded facts as true and draw all reasonable inferences in

its favor.  <u>Rivera-Gomez v. de Castro</u>, 843 F.2d 631, 635 (1st Cir. 1988).  Judgment is warranted only

if it appears beyond doubt that the non-movant can prove no set of facts in support of its claim which

would entitle it to relief.  <u>Id.</u>  The facts pled plainly support a finding that Netflix is a public

accommodation under the ADA.  Netflix's contentions regarding its level of control over captioning,

in contrast, go to liability, and depend on facts not presented in the pleadings nor available in the

litigation, as discovery has just begun.  The court may not grant Defendant's Motion for Judgment on the Pleadings based on unsupported factual allegations.  See Mangan v. Rumo, 209 F.R.D. 29 (D. Me. 2002) (ruling that on a Motion for Judgment on the Pleadings, court may not consider unsupported factual allegations in a memorandum of law.)

Moreover, Netflix's argument overlooks that the facts, as pled, demonstrate that there is programming in Netflix's streaming inventory that already has been captioned by the owner and does not implicate any control issue, but for which Netflix does not show the captioning.  See FAC ¶ 24, 26 (television and DVD versions of the Wizard of Oz have captions, but Netflix streamed the movie on Oct. 3, 2009 without captions).  In addition, Netflix has begun creating its own programming.  See "Lilyhammer" Premieres Today, Netflix US & Canada Blog (Feb. 5, 2012) http://blog.netflix.com/2012/02/lilyhammer-premieres-today.html, Ted Sarandos, Chief Content Officer, Netflix, announcing the premier on Feb. 5, 2012 of Netflix Original Series "Lilyhammer," starring Steven Van Zandt, as "the first of many brand new, original and exclusive series to debut on Netflix.").  For Netflix's original programming, there would be no issue of control over creating captions.  In addition, Netflix clearly has control over other services offered to Netflix members such as Netflix "recommendations" and genre-sorted movie listings, to which Plaintiffs claim they are denied equal access.  Thus, Netflix's arguments that it does not exert sufficient control over its programming are irrelevant to the issue of title III coverage, unsupported by the factual record, and cannot be decided on a motion for judgment on the pleadings.

**C.**      **The CVAA Does Not Preempt the ADA or Conflict With the ADA's Application to This Case**

This Court has already recognized that the CVAA did not expressly or implicitly preempt the ADA.  As this Court stated at the November 8, 2011 hearing on the Defendant's Motion to Dismiss,

"Of course, the FCC may come out with regulations that I decide are inconsistent with the ADA. I'm not bound by what the FCC does." Hr'g Tr. at 9:11-13 (Nov. 8, 2011). The Court's understanding is correct, especially because the CVAA contains no language expressly preempting ADA claims. Fundamental principles of statutory construction militate against interpreting the CVAA as repealing the ADA (or sections thereof) by implication. Further, the provision giving the FCC exclusive jurisdiction over video programming accessibility complaints under 47 U.S.C. § 613, on which Netflix relies, was not enacted by the CVAA, but, rather, its predecessor amendments to the Communications Act—that is, the Telecommunications Act of 1996. See Pub. L. No. 104-104, § 305 ("713(h)"), 110 Stat. 126 (1996) (codified at 47 U.S.C. § 613(j)). The Telecommunications Act of 1996, in turn, contains the following broad savings clause:

> NO IMPLIED EFFECT.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.

Pub. L. No. 104-104, § 601(c)(1) (reprinted in 47 U.S.C. § 152, historical and statutory notes). Because the ADA was enacted five years before the Telecommunications Act, this savings clause clearly evidences Congress' express desire to leave ADA rights and remedies intact. Cf. Sprint Telephony PCS, L.P. v. County of San Diego, 311 F.Supp.2d 898, 915 (S.D. Cal. 2004) (finding the Telecommunications Act's savings clause to be "broad, sweeping, and a clear indication that Congress intended to leave federal laws untouched and unaltered unless they specified otherwise explicitly…").

Nor can the CVAA be read as repealing by implication the judicial forum and remedies otherwise available under title III's enforcement scheme. Implied repeals are highly disfavored and only permitted on rare occasions "when the earlier and later statutes are irreconcilable." J.E.M. Ag

16

Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124, 141-42 (2001) (internal quotation omitted); see also Morton v. Mancari, 417 U.S. 535, 551 (1974) (noting "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective"); United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 9-10 (1st Cir. 2005) (same).  Moreover, this presumption against implied repeals is even stronger where, as here, the repeal would implicate federal subject matter jurisdiction.  Lahey Clinic, 399 F.3d at 9 (citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 808 (1976)).

There is no indication that Congress intended the CVAA and FCC to "carve captioning of streaming video programming from the ADA's scope," as Defendant argues.  Def.'s Mem. at 15. The support Defendant relies on for this position is its mistaken claim that the CVAA applies to all streaming video programming produced at any time.  Id.  However, the CVAA clearly covers only programming "delivered using Internet protocol that was published or exhibited on television with captions after the effective date of such regulations."  47 U.S.C. § 613(c)(2)(A); 49 C.F.R. § 79.4(b). Any programming shown on television before September 30, 2012 will not be required to be captioned when streamed, unless the programming is shown again on television on or after September 30, 2012.  Further, content that is never shown on television (such as Netflix original content or certain films) is not covered by the CVAA.  Therefore, Plaintiffs' claims cannot be resolved by the CVAA alone.

Defendant incorrectly relies on Zulauf v. Kentucky Educational Television, 28 F.Supp.2d 1022 (E.D. Ky. 1998) to support its argument that the FCC's administrative complaint scheme preempts the ADA's private right of enforcement.  Def.'s. Mem. at 18.  In Zulauf, a plaintiff sued an educational broadcaster (KET) alleging violations of the ADA and the Rehabilitation Act due to

17

failure to provide closed captioning for some television programming.  Defendant KET moved to dismiss based on the FCC's exclusive jurisdiction over issues relating to television captioning pursuant to § 613(h) of the Telecommunications Act of 1996.  Zulauf, 28 F.Supp.2d at 1023.  After noting that the Telecommunications Act did not preempt the ADA or Rehabilitation Act, the district court nonetheless concluded that primary jurisdiction considerations warranted dismissal so that plaintiff could exhaust his administrative remedies with the FCC before pursuing his civil rights complaint.  Id. at 1023-24.  The court dismissed the action based on its belief that, because resolution of plaintiff's civil rights claims would require interpretation of the Telecommunications Act and the FCC's implementing regulations, judicial resolution of plaintiff's civil rights claims—at least in the first instance—would be "inefficient and a waste of judicial resources."  Id. at 1024.

    Zulauf is distinguishable because in Zulauf, each ADA/Rehabilitation Act claim mirrored a potential administrative claim under the FCC's implementing regulations.  Here, by contrast, *none* of Plaintiffs' ADA claims at present mirror potential CVAA-related administrative claims because the CVAA regulations do not apply to any of Netflix's current inventory; and some of plaintiffs' claims will never be covered by the CVAA.  The CVAA will never apply to Netflix's inventory that does not air on television (such as Netflix original content or other programming), nor to inventory that only airs on television before September 30, 2012.  Moreover, also falling outside the FCC's administrative jurisdiction are Plaintiffs' allegations that Netflix violates title III of the ADA by failing to provide equal access to other services offered to Netflix members (such as Netflix "recommendations" and genre-sorted movie listings).

    Simply put, no irreconcilable conflict exists between title III of the ADA and § 202(b) of the CVAA, codified at 47 U.S.C. § 613.  Title III's broad remedial mandate generally prohibits

disability-based discrimination by public accommodations in a wide range of contexts and provides

for enforcement in federal courts by aggrieved parties and the Attorney General.  See 42 U.S.C.

§§ 12182, 12188.  Section 202(b) of the CVAA, on the other hand, focuses more narrowly on

regulatory standards for closed captioning of certain Internet Protocol-delivered video programming

(*i.e.*, video programs previously exhibited on television after certain dates) and limits enforcement to

administrative complaints.  More specifically, there is no inherent tension between, on the one hand,

47 U.S.C. § 613's grant of exclusive FCC jurisdiction over complaints "under this section" and, on

the other hand, title III claims—such as those raised in the First Amended Complaint—alleging

failure to provide equal access to Internet-delivered video programming due to lack of closed

captioning and other related services.  Necessarily, Plaintiffs' title III claims arise "under" the ADA,

not 47 U.S.C. § 613's administrative scheme.

Thus, title III of the ADA and the CVAA can be read to coexist, especially given their

differing legislative focus, requirements, forums, and remedies.  Cf. Connecticut Nat'l Bank v.

Germain, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting,

and so long as there is no 'positive repugnancy' between two laws . . . a court must give effect to

both.") (internal citation omitted); Rathbun v. Autozone, Inc., 361 F.3d 62 (1st Cir. 2004) (differential

treatment under two different statutes of factually identical claims is not a proper ground for repeal

by implication); Baumgardner v. County of Cook, 108 F.Supp.2d 1041, 1043-51 (N.D. Ill. 2000)

(permitting disabled employee to assert title I-based ADA claim against county employer, as well as

equal protection claim under § 1983 against individual supervisor, even when same facts formed

basis for both claims).  Under such circumstances, the CVAA cannot, as a matter of law, be deemed

to impliedly repeal title III of the ADA.

## CONCLUSION

For the foregoing reasons, Defendant Netflix's Motion for Judgment on the Pleadings under

Fed. R. Civ. P. 12(c) should be denied.


Dated: May 15, 2012

<div style="margin-left:40%">

Respectfully submitted:

Thomas E. Perez
Assistant Attorney General
Civil Rights Division

Carmen M. Ortiz
United States Attorney

Eve Hill
Senior Counselor to the Assistant Attorney General
Civil Rights Division

Allison J. Nichol, Chief
Kathleen P. Wolfe, Special Litigation Counsel
Alberto Ruisanchez, Deputy Chief
Disability Rights Section

  /s/ Amanda Maisels
Amanda Maisels

Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
1425 NY Avenue Building
Washington, D.C.  20530
(202) 305-8454
(202) 307-1198 (fax)
amanda.maisels@usdoj.gov

Counsel for United States of America

</div>

CERTIFICATE OF SERVICE

I hereby certify that, on May 15, 2012, I electronically filed the **Statement of Interest of the United States of America in Opposition to Defendant's Motion for Judgment on the Pleadings** with the Clerk of the Court using the CM/ECF system which will send Notices of Electronic Filing (NEF) to all registered participants and that paper copies will be sent to those counsel listed as non-registered participants on this same date.


   /s/ Amanda Maisels

AMANDA MAISELS
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
1425 N.Y. Avenue Building
Washington, D.C. 20530

(202) 305-8454
(202) 307-1198 (fax)
amanda.maisels@usdoj.gov

Counsel for United States of America