# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

## WESTERN DIVISON

NATIONAL ASSOCIATION OF THE
DEAF, WESTERN MASSACHUSETTS
ASSOCIATION OF THE DEAF AND
HEARING IMPAIRED AND LEE
NETTLES,
          Plaintiffs,

   v.

NETFLIX, INC., a corporation,
          Defendant.

CIVIL ACTION NO. 11-30168-MAP

**PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS**

**[ORAL ARGUMENT REQUESTED]**

**Date:**   June 11, 2012

**Court:**  Hon. Michael A. Ponsor
U.S. District Court
Third Floor
300 State Street
Springfield, MA

# TABLE OF CONTENTS

**Page No.**

I.      INTRODUCTION…………………………………………………..…………………1

II.     ARGUMENT .................................................................................................................... 4

    A.  Netflix is a Place of Public Accommodation Under the ADA ..................................... 4

    B.  The Pleadings Establish that Netflix has the "Control" Necessary to Caption its
        Watch Instantly Content; Netflix's Arguments on this Issue Raise Questions of Fact. .
        .................................................................................................................................... 8

        1.  The cases Netflix cites do not support its argument that it lacks control over its
            Watch Instantly programming. .............................................................................. 9

    C.  The CVAA Does Not Carve Out Access to Streaming Video from the ADA. .......... 10

        1.  The ADA prohibits an interpretation that the CVAA repealed the ADA by
            implication. .......................................................................................................... 12

        2.  The CVAA does not cover the "whole subject" of the ADA nd was not intended
            as a substitute. ..................................................................................................... 14

        3.  The CVAA and the ADA are not in conflict and are easily harmonized. ............ 16

        4.  NAD's advocacy for a broader implication of CVAA in agency proceedings is
            immaterial. ........................................................................................................... 19

    D.  Plaintiffs' Claim is Not Moot .................................................................................... 20

III.    CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page No.**

**CASES**

*Am. Council of the Blind v. Astrue*, 2008 U.S. Dist. LEXIS 86524, *24 (N.D. Cal. 2008)..... 11,12

*Barton v. Clancy*, 632 F.3d 9 (1st Cir. 2011)................................................................. 7

*Baumgardner v. County of Cook*, 108 F. Supp. 2d 1041, 1043-51 (N.D. Ill. 2000)..................... 16

*Boots v. Northwestern Mutual Life Ins.*, 77 F. Supp. 2d 211, 216 (D.N.H. 1999) ........................ 6

*Branch v. Smith,* 538 U.S. 254, 273 (2003) ................................................................. 13

*Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 959 F. Supp. 496 (N.D. Ill. 1997) ......... 10

*Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n,* 37 F.3d 12 (1st Cir. 1994) .................. passim

*Coddington v. Adelphi Univ.*, 45 F. Supp. 2d 211 (E.D.N.Y. 1999) ............................................ 10

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)..................................................... 16

*Conners v. Maine Med. Ctr.,* 42 F. Supp. 2d 34, 46 (D. Me. 1999) ............................................. 5

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33, 35 (2003) ........................ 16

*Doe v. Mutual of Omaha Ins. Co.,* 179 F.3d 557, 559 (7th Cir. 1999)............................................ 6

*Doukas v. Metropolitan Life Ins. Co.*, 950 F. Supp. 422, 427 (D.N.H. 1996)................................ 6

*Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003)................................................ 1

*Fiedler v. American Multi-Cinema*, 871 F. Supp. 35, 37-38 (D.D.C. 1994) ................................ 12

*Fletcher v. Tufts Univ.*, 367 F. Supp. 2d 99, 115 (D. Mass. 2005)................................................. 5

*Greenless v. Almond*, 277 F.3d 601, 604-06, 609 n.8 (1st Cir. 2002) ......................................... 16

*Guckenberger v. Boston Univ.*, 957 F. Supp. 306 (D. Mass. 1997)............................................... 10

*InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003) ......................................................... 19

*Iwata v. Intel Corp.*, 349 F. Supp. 2d 135 (D. Mass. 2004).......................................................... 7

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001) ................... 13

*Kepner v. United States*, 195 U.S. 100, 125 (1904).................................................................... 16

*Lopez v. Mass.*, 588 F.3d 69 (1st Cir. 2009) ............................................................................. 7

*Marrero-Gutierrez v. Molina,* 491 F.3d 1, 5 (1st Cir. 2007) ......................................................... 4

*Morgan v. Joint Admin. Bd., Ret. Plan of the Pillsbury Co.,* 268 F.3d 456, 459 (7th Cir. 2001)... 6

*Morton v. Mancari,* 417 U.S. 535, 551 (1974) ............................................................................ 13

*Nat. Resources Def. Council, Inc. v. U.S. Envt'l. Prot. Agenc*y, 824 F.2d 1258, 1279 (1st Cir. 1987)........................................................................................................................................... 15

*Neff v. American Dairy Queen Corp.,* 58 F.3d 1063, 1066, 1067–170 (5th Cir. 1995) ........... 9, 10

*Pasdon v. City of Peabody*, 417 F.3d 225, 226 (1st Cir. 2005) ..................................................... 4

*Passamaquoddy Tribe v. State of Maine,* 75 F.3d 784, 789-90 (1st Cir. 1996)............................ 13

*PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676 (2001) .................................................................... 6

*Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 964-67(9th Cir. 2006)................................... 10

*Rathbun v. Autozone, Inc.,* 361 F.3d 62, 68 (1st Cir. 2004)........................................ 16, 17, 18, 19

*Sprietsman v. Mercury Marine*, 537 U.S. 51, 67 (2002) ............................................................... 16

*Stewart v. Smith*, 673 F.2d 485, 492 (D.C. Cir. 1982)................................................................. 16

*Tompkins v. United Health Care of New England*, 203 F.3d 90, 95 n.4 (1st Cir. 2000)................ 5

*Zulauf v. Kentucky Educational Television*, 28 F. Supp. 2d 1022-23 (E.D. Ky. 1998)................ 17

**STATUTES**

42 U.S.C. § 12201................................................................................................................... 1,4

42 U.S.C § 12181................................................................................................................... 1, 5

42 U.S.C. § 12182........................................................................................................... 1, 2, 8, 15

42 U.S.C. § 12188...................................................................................................................... 1

42 U.S.C. § 12201.................................................................................................................... 12

47 U.S.C. § 152........................................................................................................................ 4

47 U.S.C. § 613........................................................................................................... 3, 11, 14, 15

Pub. L. No. 104-104, § 601(c)(1)............................................................................................... 4

Pub. L. No. 111-260 § 102, § 203………………………………………………………….…..3

**LEGISLATIVE AND REGULATORY HISTORY**

H.R. Rep. 101-485(II), 108..................................................................................................... 6, 7

House Comm. on Ed. and Labor, HR Rep No. 485, Ed. and Labor Report at 135, 136 (1990)... 13

75 Fed. Reg. 43460, 43467 (July 26, 2010). ................................................................................ 6

77 Fed. Reg. 19480, 19488 (March 30, 2012) ............................................................................ 18

**REGULATIONS**

28 C.F.R. § 36.103 ................................................................................................................ 4

28 C.F.R. §36.103 ............................................................................................................... 12

47 C.F.R. § 79.4 .......................................................................................................... passim

# I.    INTRODUCTION

The Americans with Disabilities Act ("ADA") "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 USC § 12101(b)(1). In keeping with this purpose, Title III of the ADA requires that individuals with disabilities have "full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Congress intended judicial review of enforcement actions by private citizens, like this action, to be a primary mechanism for implementing the anti-discrimination rights guaranteed by the ADA, along with oversight by the Department of Justice ("DOJ"). *See Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003); 42 U.S.C. § 12188.

Netflix argues that Plaintiffs are precluded from seeking redress under the ADA, despite the direct application of ADA principles and provisions to this case. Netflix's arguments are all fatally flawed. First, Netflix's argument that it is not a public accommodation under Title III is based on a faulty analysis of Title III and discredits First Circuit case law in *Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n*, 37 F.3d 12 (1st Cir. 1994), and its progeny. Contrary to Netflix's assertion, Plaintiffs are not arguing that the list of public accommodations needs to be expanded. Plaintiffs have alleged that Netflix is a public accommodation within the enumerated list: "place of exhibition and entertainment," "place of recreation," "sales or rental establishment," and "service establishment[]." 42 U.S.C § 12181(7); (FAC ¶ 48.)[1] The narrow question is whether Netflix is exempt from ADA coverage because it sells entertainment services over the internet instead of out of a physical structure. As recognized by the First Circuit, it would undermine Congressional purpose to hold that the activities listed in Title III are covered

---

[1] "FAC" refers to Plaintiffs' First Amended Complaint, ECF No. 19.

only when they occur in buildings.  This is especially true of businesses that sell their goods and services on the internet.  All of the areas of daily community life, including entertainment, that Congress intended to be equally accessible to people with disabilities in Title III increasingly moved to the internet in the decades since the ADA was deliberated and passed.  As the First Circuit stated in *Carparts,* 37 F.3d at 19:

> It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not.  *Congress could not have intended such an absurd result*." (emphasis added).[2]

It would be equally "absurd" and "irrational" to hold that the entertainment delivered to customers by Netflix over the internet is not covered by Title III.  Nowhere is the move to the internet more ubiquitous than in the category of entertainment.  Netflix's Watch Instantly service is the "fastest growing entertainment venue in the country," with an estimated share of over 60% of the industry market, but it is not fully accessible to the over 36 million Americans who are deaf and hard of hearing. (FAC ¶¶ 1, 4, 18-20.)[3]

Likewise, Netflix uses an incorrect analysis in its argument that it does not control its inventory.  Section 302(a) of Title III provides that:

> [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).  There is no question that Netflix owns and operates Watch Instantly, the public accommodation at issue.  The cases that Netflix cites about "control" do not address the question of whether Netflix is a public accommodation.  Whether or

---

[2] *See infra* at 6 n.11.
[3] *See also* Answer of Defendant Netflix, Inc. to First Amended Complaint (ECF No. 34), at ¶ 5 (admitting that Netflix has over 20 million subscribers).

not Netflix has the ability to make the modifications Plaintiffs seek is a question of

remedy.  Moreover, Netflix's claim that it is unable to provide closed captions is dubious

on several levels.  The speculative claim that the remedy Plaintiffs seek would violate

copyright law is questionable legally, is undermined by Netflix's practices and public

statements, is not raised in its Answer, and, at the very least, raises genuine issues of

material fact.  Without discovery into Netflix's various arrangements with its suppliers to

provide caption files and whether permission to caption has been sought or ever denied,

the factual issues it raises cannot be finally resolved.

Finally, Netflix contends, as it did in its previous Motion to Dismiss (ECF No.

22)[4] that the CVAA[5] nullifies Plaintiffs' rights to full and equal access to public

accommodations under the ADA. The CVAA assigned the Federal Communications

Commission ("FCC") a limited role to ensure that captions on televised programming

continue when streamed to the internet.  (*See* ECF No. 26, Plaintiffs Opposition to

Netflix's Motion to Dismiss ("Pls.' Opp.") at 2.)[6]  The CVAA and the recently published

regulations require captioning on, at most, a limited portion of Netflix's streaming

library, as the CVAA only affects programming shown on television with captions *after*

September 30, 2012.  *See* 47 U.S.C. § 613(c)(2)(A).  Netflix argues that Congress's

attempt to ensure that televised programming continues to be captioned as it moves to the

internet drastically "carved out" the rights to effective communication under the ADA.

This interpretation is untenable for several reasons, including an explicit provision in the

---

[4] ECF No. 43, Netflix's Motion for Judgment on the Pleadings ("Motion") at 2-3, 13-18.
[5] Twenty-First Century Communications and Video Accessibility Act.  47 U.S.C. § 613 *et seq.*
[6] The CVAA covers issues that do not arise in this case and would not be covered by the ADA, including hearing aid compatibility (§102), closed captioning decoder devices (§203), and user interfaces on digital apparatuses (§205).  *See* Pub. L. No. 111-260

ADA which preserves ADA rights unless another law provides greater protections. 2 U.S.C. § 12201(b); 28 C.F.R. § 36.103(c). Netflix's position would turn the ADA's protective provision on its head by interpreting the less protective statute, the CVAA, to trump the ADA even though compliance with both statutes is complementary. Even without the ADA's explicit statutory provision, well-established statutory interpretation doctrines and case law strongly disfavor repeal by implication.[7] Finally, Netflix's position is all the more remarkable because it would leave Plaintiffs with no remedy for the content in the Watch Instantly library that is not and may never be in the CVAA's scope.[8]

Plaintiffs have pleaded that Netflix is a public accommodation under Title III (FAC ¶ 48)), and that it does not provide equal access to its Watch Instantly streaming content or its recommendations system. These allegations suffice to state an ADA claim, and Netflix's Motion should be denied.[9]

## II.    ARGUMENT

### A.  Netflix Is a Place of Public Accommodation Under the ADA.

Netflix confuses ADA analysis by claiming that Plaintiffs are asking this Court to expand the list of types of accommodations covered by Title III. To the contrary, Plaintiffs allege that

---

[7] A savings clause in the Telecommunications Act ("TCA") requires an explicit statement for the Act or its amendments to in any way limit another statute. *See* Pub. L. No. 104-104, § 601(c)(1) (reprinted in 47 U.S.C. § 152, historical and statutory notes; *see also* ECF No. 24, DOJ Statement of Interest at 2, 9.

[8] *See infra* at 11 n.21, 14.

[9] The standard applied in reviewing a motion for judgment on the pleadings is the same standard that is used for reviewing a motion to dismiss. *Marrero-Gutierrez v. Molina,* 491 F.3d 1, 5 (1st Cir. 2007). A trial court is to "accept all of the nonmovant's well-pleaded factual averments as true, and draw all reasonable inferences in his favor." *Pasdon v. City of Peabody*, 417 F.3d 225, 226 (1st Cir. 2005).

Netflix operates a place of public accommodation as defined by Title III of the ADA, 42 U.S.C § 12181(7) ("place of exhibition and entertainment," "place of recreation," "sales or rental establishment," and "service establishments"). Netflix admits that it is a business that provides a subscription service of internet-based streaming videos available for viewing its "Watch Instantly" content and that it has over 20 million subscribers. (ECF No. 34, Answer, at ¶¶ 5, 13.) The only question posed to this Court is whether because Netflix conducts its large-scale streaming business with over 20 million subscribers (FAC ¶ 5; Answer ¶ 5) on the internet instead of through stores, it is shielded from the reach of the ADA provisions which provide deaf and hard of hearing customers the right to equal access.

While Netflix tries to discredit and distinguish First Circuit precedent, the reasoning of the First Circuit and its district courts in cases that have consistently held that public accommodations under Title III are not limited to physical structures, applies equally here. The seminal case on this issue, *Carparts,* 37 F.3d at 20, held that the health care plans of individuals living with AIDS are places of public accommodation, despite the fact that they are not physical structures. The First Circuit observed that "[w]hether establishments of 'public accommodation' are limited to actual physical structures is a question of first impression in this Circuit," and found "that they are not so limited." *Id*. at 19. *Carparts* analyzed the language of Title III and *broadly* concluded that:

> The plain meaning of the terms *do not require 'public accommodations' to have physical structures for persons to enter*. Even if the meaning of 'public accommodation' is not plain, it is, at worst, ambiguous. This ambiguity, considered together with agency regulations and public policy concerns, persuades us that *the phrase is not limited to actual physical structures*…Congress clearly contemplated that 'service establishments' include providers of services which do not require a person to physically enter an actual physical structure…one can easily imagine the existence of other service establishments conducting business by mail and phone without providing facilities for their customers to enter in order to utilize their services. It would be irrational to conclude that persons who

enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. *Congress could not have intended such an absurd result.*" *Id.* (emphasis added).[10]

*Carparts*' reasoning applies equally to places of public accommodation that operate on the internet.[11]  In fact, the legislative history of the ADA bolsters this interpretation, as Congress envisioned technological advances that would "further enhance options for making meaningful and effective opportunities available to individuals with disabilities."  *See* H.R. Rep. 101-485(II), 108.  Congress intended that

> [technological] advances may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose unique burdens on such entities. Indeed, the Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times.  *Id.*

Congressional intent to keep the ADA up to date with technological developments was emphasized in the Department of Justice's recent rule making process.[12]  The DOJ stated that

> [t]he internet as it is known today did not exist when Congress enacted the ADA and, therefore, neither the ADA nor the regulations the Department promulgated under the ADA specifically address access to websites. But the statute's broad and expansive nondiscrimination mandate *reaches goods and services provided by covered entities on websites over the internet…*Congress contemplated that the Department would apply the

---

[10] *Carparts* has been cited approvingly many times by the First Circuit, its district courts, and in other circuits. *See Tompkins v. United Health Care of New England*, 203 F.3d 90, 95 n.4 (1st Cir. 2000); *Fletcher v. Tufts Univ.*, 367 F. Supp. 2d 99, 115 (D. Mass. 2005); *Conners v. Maine Med. Ctr.,* 42 F. Supp. 2d 34, 46 (D. Me. 1999); *Boots v. Northwestern Mutual Life Ins.*, 77 F. Supp. 2d 211, 216 (D.N.H. 1999); *Doukas v. Metropolitan Life Ins. Co.*, 950 F. Supp. 422, 427 (D.N.H. 1996); *see also Morgan v. Joint Admin. Bd., Ret. Plan of the Pillsbury Co.,* 268 F.3d 456, 459 (7th Cir. 2001) (rejecting literal interpretation of public accommodation as a physical site); *Doe v. Mutual of Omaha Ins. Co.,* 179 F.3d 557, 559 (7th Cir. 1999) ("The core meaning of [Title III]…is that the owner or operator of a store… theater, *Web site,* or other facility whether in physical space or in electronic space...that is open to the public cannot exclude disabled persons.") (emphasis added).

[11] As the Supreme Court has held, the definition of public accommodation "should be construed liberally." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676 (2001).

[12] "Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations," 75 Fed. Reg. 43460, 43467 (July 26, 2010).

statute in a manner that evolved over time, and it delegated authority to the Attorney General to promulgate regulations to carry out the Act's broad mandate. Consistent with this approach, the Department stated in the preamble to the original 1991 ADA regulations that *the regulations should be interpreted to keep pace with developing technologies….* the ADA mandate for 'full and equal enjoyment' requires nondiscrimination by a place of public accommodation in the offering of <u>all</u> its goods and services, *including those offered via websites. Id.* (emphasis added) (internal citations omitted).

Today mainstream America uses the internet for educational, economic, and recreational purposes; therefore, the goal of Title III of the ADA cannot be met without also construing internet businesses, such as Netflix, as places of public accommodation.  Streaming video programming is increasingly how Americans seek media entertainment services, and people who are deaf and hard of hearing desire full and equal access to these services.[13]

Netflix's claim that recent decisions within the First Circuit have called *Carparts* into question is false.  (Motion at 10.)  Netflix cites *Barton v. Clancy*, 632 F.3d 9 (1st Cir. 2011), and *Lopez v. Mass.*, 588 F.3d 69 (1st Cir. 2009), in which the First Circuit stated that *Carparts* "involved…an unusual set of facts, and a particular procedural posture."  *Barton*, 632 F.3d at 19; *Lopez*, 588 F.3d at 88.  Netflix fails to mention that neither case even touched on whether places of public accommodation can include non-physical structures.  Rather, the First Circuit's statements were made in the context of entirely unrelated discussions regarding the definition of "employer" under the ADA (in *Barton*) and Title VII of the Civil Rights Act (in *Lopez*).

*Iwata v. Intel Corp.*, 349 F. Supp. 2d 135 (D. Mass. 2004), is equally irrelevant. The plaintiff in *Iwata* did not bring an action under Title III and the definition of a place of public accommodation was not at issue.  *See id.*

---

[13] *See, e.g.*, FAC ¶¶ 1, 3, 4, 15, 35.

There is no reason for the Court to depart from the First Circuit's determination in

*Carparts* that the ADA is not limited to physical structures or to decline to hold that Netflix is a

public accommodation.

### B.   The Pleadings Establish that Netflix Has the "Control" Necessary to Caption its Watch Instantly Content; Netflix's Arguments on this Issue Raise Questions of Fact.

There is no question that the actions of Netflix are attributable to Netflix under Title III.

Section 302(a) provides that:

> [n]o individual shall be discriminated against on the basis of disability in the full
> and equal enjoyment of the goods, services, facilities, privileges, advantages, or
> accommodations of any place of public accommodation by any person who owns,
> leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).  Plaintiffs have correctly alleged that Netflix owns and operates Netflix

and is, thus, subject to Title III of the ADA. (FAC at ¶¶ 13, 16-19, 26.)  Netflix does not dispute

its ownership in its Answer, nor does it raise a defense as to its lack of control; indeed, Netflix

makes numerous admissions that establish its ability to control captioning.[14]  Therefore, Netflix's

Motion for Judgment on the Pleadings should be denied.

Any further issues about Netflix's ability to provide captions involve questions of fact

which cannot be addressed on a motion for judgment on the pleadings.  Netflix muddles the

ADA analysis by confusing whether Plaintiffs allege discrimination by an entity covered by Title

---

[14] *See, e.g.*, Netflix's prior admissions that it "provides closed captioning on its internet-based
streaming video content to the extent it is economically or technologically feasible. Defendant
has been working, and continues to work, to make closed captioning available on an increasing
amount of its internet-based streaming video since 2008." (Answer at 13-15); *see also*
Declaration of Neil S. Hunt (ECF No. 21-2) (stating that he supervises the teams responsible for
captioning, and that Netflix manages captioning of its streaming content in its Los Gatos and
Beverly Hills locations); Declaration of David McDowell (ECF No. 21-1), Exhs. C, E, F.  The
only defenses Netflix asserted in its Answer were that technology has posed a barrier to
captioning, that providing captioning would constitute a fundamental alteration of its business
practices, and that providing captioning would constitute an undue burden. (Answer at 13, 15).

III with whether Netflix may be able, at some later date, to raise a defense that it is unable to

provide captions to some content because another entity will not allow it.  Netflix sets forth a

parade of horrors in its motion, [15] that are not only unsupported, but are in fact contradicted in

Netflix's Answer, blog postings, current practices, and previous posture in this case, but all of

these issues would require further facts to resolve.[16]

    The pleadings in this case make clear that Netflix claims to have captioned its viewed

programming, has announced that it has "released the technology" to enable captions on its

programming and that it "will be working to fill in the [Watch Instantly] library over time."

(FAC at ¶ 18; *see also* Answer at 13-15.)  Further discovery would reveal the terms of the

contracts Netflix has with suppliers, whether Netflix seeks permission to caption, how much of

the content Netflix receives has caption files and other facts pertinent to this defense.  The

specter of copyright infringement alone cannot justify judgment on the pleadings, as the

pleadings directly contradict it.[17]

### 1.    The cases Netflix cites do not support its argument that it lacks control over its Watch Instantly programming.

    In support of its copyright defense, Netflix cites various cases from other circuits that are

irrelevant to the situation here.  (Motion at 6-7).  *Neff v. American Dairy Queen Corp.,* 58 F.3d

1063, 1066, 1067–170 (5th Cir. 1995), cert. denied, 516 U.S. 1045, 1065 (1996), "present[ed] a

*narrowly defined* issue…: whether a franchisor with limited control over a franchisee's store

---

[15] *See* Motion at 1 (arguing that "issues of copyright ownership, control, practical burdens, and economic reality greatly complicate the process in ways the ADA does not and cannot address"; *id.* at 18 (contending that "whether Netflix even has the legal right to caption all the video programming Plaintiffs' seek, would have Netflix create infringing derivative works that conflict with the video owners' copyrights").

[16] *See supra* 8 n.15 and accompanying text.

[17] Plaintiffs have already propounded discovery on the issues of control and the contents of Netflix's contracts regarding captioning as of March 22, 2012.

'operates a place of public accommodation." *Id*. at 1066.  There is no question that Netflix

"operates" and "owns" the Watch Instantly streaming site accessed through www.netflix.com.

In *Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 964-67(9th Cir. 2006)*,* a wheelchair

user sued Pier 1 Imports because the entry to the store was obstructed by a grassy area on the

sidewalk which was not owned or operated by Pier 1.  By contrast, here there is no question that

Netflix operates the Watch Instantly site.  The extent of control and the ease or difficulty of

obtaining captions is wholly different than the issue in *Pickern* which involved an entity with

which the defendant had no relationship.[18]  It is quite a stretch for Netflix to claim that its

relationship to its Watch Instantly video content is similar to the distant relationship between a

franchisor and a franchisee described in *Neff* and *Cortez*, or the complete lack of ownership or

operative control discussed in *Pickern*.   Netflix's admissions in its Answer establish that it has

various means of providing captions, and Plaintiffs will explore this issue further in discovery if

necessary.[19]

### C.  The CVAA Does Not Carve Out Access to Streaming Video from the ADA.

While Netflix makes much of the process involved in enacting the CVAA and in the

implementing regulations, it fails to cite any language in the statute, FCC regulations, or the

legislative history that support its contention that Congress intended the CVAA to partially

repeal the ADA.  As previously discussed by Plaintiffs in their Opposition to Netflix's Motion to

---

[18] The other cases cited by Netflix are completely off point, having to do with whether there is personal liability under the ADA (*Coddington v. Adelphi Univ*., 45 F. Supp. 2d 211 (E.D.N.Y. 1999), *Guckenberger v. Boston Univ*., 957 F. Supp. 306 (D. Mass. 1997)), or whether a booking agent is liable for the actions of all of the tours it books (*Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 959 F. Supp. 496 (N.D. Ill. 1997)).

[19] *See*, *e.g.,* Netflix's Answer, stating that it "provides closed captioning on its internet-based streaming video content to the extent it is economically or technologically feasible. Netflix has been working, and continues to work, to make closed captioning available on an increasing amount of its internet-based streaming video since 2008." (Answer at pp. 13, 14, 15).

Dismiss (ECF No. 26, "Pls.' Opp."), however, and consistent with the position taken by the

Department of Justice ("DOJ") in its Statement of Interest (ECF No. 24), Plaintiffs' claim under

the ADA remains largely unaffected by the FCC's interpretation of the CVAA because: (1) the

FCC regulations implement the CVAA, not the ADA (*see* Pls.' Opp. at 5); and (2) CVAA (and

thus, necessarily, the FCC regulations) ensure captioning for programming shown only on

television after September 30, 2012, not all video content shown over the internet and will thus

only affect a portion of Netflix's library (*see* 47 U.S.C. § 613(c)(2)(A); 47 C.F.R. § 79.4; Pls.'

Opp. at 7.)  As Plaintiffs expect to show through discovery, the amount of material which would

not be covered by the CVAA is increasing as Netflix pushes to make contracts directly with the

studios to stream movies *before* they appear on TV and to create Netflix original programming to

be shown first on its streaming site.[20]

  Ironically, Netflix argues that Congressional intent behind the CVAA to "insure that

individuals with disabilities are able to fully utilize communications services and equipment and

better access video programming" justifies stripping individuals who are deaf and hard of

hearing of their ADA rights, leaving them with no redress for inferior service by a public

accommodation.  (Motion at 15) (citations omitted).  By enacting the CVAA, Congress intended

to *improve* access to video programming, not limit access or relief under the separate ADA.[21]  It

---

[20] *See* Brooks Barnes and Brian Stelter, "Netflix Secures Streaming Deal with DreamWorks,"
N.Y. Times, September 25, 2011 (available at:
http://www.nytimes.com/2011/09/26/business/media/netflix-secures-streaming-deal-with-
dreamworks.html?pagewanted=all)  Recently, Netflix's Chief Content Officer, Ted Sarandos,
announced plans to develop original programming in addition to its current show, "Lilyhammer"
(See http://gigaom.com/video/netflix-original-programming/).

[21] As the court stated in response to a similar argument by The Social Security Administration
(SSA) that the "Special Notice Provision" in the Social Security Act superseded rights under
Section 504, "[t]hat Congress somehow intended to relieve the agency of its obligations to them
under the Rehabilitation Act is far-fetched. Congress intended to *improve* the notice provided to
blind recipients when it passed the special notice provision, not to *limit* such notice." *See Am.*

would be extraordinary to interpret the CVAA as silently repealing a key part of the ADA,

requiring full and equal access by public accommodations. As set forth below, there is no

indication that Congress intended to limit the reach of the ADA with the CVAA.

> **1.  The ADA prohibits an interpretation that the CVAA repealed the ADA by implication.**

The argument that the CVAA, which provides plaintiffs less protection than the ADA in

this case, would trump the full and equal access provisions of the ADA is particularly untenable

given Congress's intent to set the ADA as a floor which could only be trumped by statutes which

provide greater protection.  As the ADA provides:

> Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law…that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter.

 42 U.S.C. §12201(b); 28 C.F.R. §36.103(c).  The inevitable logical conclusion of this language

is that the ADA will not be invalidated by a statute that provides lesser protection.  In a situation

similar to the one here, *Fiedler v. American Multi-Cinema*, 871 F. Supp. 35, 37-38 (D.D.C.

1994), the court stated:

> the ADA itself expressly contemplates that entities to which it applies might be subject to two or more separate sets of obligations with respect to their treatment of handicapped patrons. *See* 42 U.S.C. § 12201(b)… AMC maintains that the provisions of the ABA and the ADA may potentially conflict with one another, but it has made no showing here that its compliance with the ADA in this case would be inconsistent with any obligation it may also have inherited under the ABA as the lessee of a federal landlord.

*Id.*  Likewise, Netflix has made no showing that complying with the ADA would in any way

violate CVAA.

---

*Council of the Blind v. Astrue*, 2008 U.S. Dist. LEXIS 86524, *24 (N.D. Cal. 2008); *see also*
Pls.' Opp. at 7, n.4.

Moreover, there is no reason to invalidate either the ADA or CVAA as they are easily harmonized.  The ADA's legislative history makes it clear that that Congress intended conflicts to be harmonized whenever possible; as it states that:

> to the extent that this legislation could be construed to be in conflict with other laws…the Committee expects the Attorney General to exercise coordinating authority to avoid and eliminate such conflict. [22]

Plaintiffs' argument that the ADA and the CVAA can and should be reconciled reflects Congress' intention to preserve the ADA, particularly where it affords greater protection, as it does in this case.[23]

Netflix's attempt to invoke the CVAA to repeal portions of the ADA contravenes the fundamental principles of statutory interpretation requiring that "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001) (quoting *Morton v. Mancari,* 417 U.S. 535, 551 (1974)). Moreover, "absent a clearly expressed congressional intention, repeals by implication are not favored.  An implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter act covers the whole subject of the earlier one and is clearly intended as a substitute."  *Branch v. Smith,* 538 U.S. 254, 273 (2003) (plurality op.) (internal quotation marks and citations omitted); *see also Morton,* 417 U.S. at 550 ("[T]he only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.")

---

[22] House Comm. on Ed. and Labor, HR Rep No. 485, Ed. and Labor Report at 135, 136 (1990).
[23] The First Circuit has upheld savings clauses in previously enacted federal statutes, when newly enacted statutes failed to explicitly limit prior acts. *See Passamaquoddy Tribe v. State of Maine,* 75 F.3d 784, 789-90 (1st Cir. 1996).

### 2. The CVAA does not cover the "whole subject" of the ADA and was not intended as a substitute.

Netflix ignores allegations in Plaintiffs' complaint about Watch Instantly programming and equal access to its website services that are not addressed in the CVAA, could not be the subject of a CVAA complaint, and for which the ADA is the only remedy.  By their express terms, the CVAA and the FCC regulations apply only to programming appearing with captions on television beginning on September 30, 2012.  *See* 47 U.S.C. § 613(c)(2)(A); 47 C.F.R. § 79.4; (Pls.' Opp. at 5-6.)[24]   Because the content covered by the CVAA and the "Watch Instantly" programming are not co-extensive, Netflix is arguing that Plaintiffs have no remedy under either the CVAA or the ADA for Watch Instantly programming that is outside the scope of the CVAA.

The Watch Instantly programming that is beyond the scope of the CVAA includes content that Netflix contracted with studios to bypass distribution on television, and Netflix's growing original programming which will show first (and exclusively) on Netflix and may never appear on television, and foreign programming such as "Lilyhammer," shown exclusively on Netflix in the U.S.  *See supra* n.21.  Moreover, Plaintiffs allege that the much touted Netflix recommendation system does not afford equal access to for the deaf and hard of hearing, as it does not equally index captioned content.  (FAC ¶19.)  These allegations are outside the scope of the CVAA complaint procedures prescribed by the FCC regulations.

Netflix attempts to paint the CVAA as having a much wider scope than it actually has, and thereby demonstrates its substantial misunderstanding of the CVAA.   Netflix falsely asserts that the "CVAA applies to *all streaming video programming produced at any time,* including anything that will have been exhibited on television *'prior to'* or 'after' the effective date (April 30, 2012)."  (Motion at 16.) (emphasis added.)  It cannot be contested that the CVAA applies

---

[24] *See infra* at 14-16.

only to: "full length video programming…with closed captions *if the programming is published or exhibited on television in the United States with captions on or after*" dates beginning on September 30, 2012.  47 CFR § 79.4(b) (emphasis added); 47 U.S.C. § 613(c)(2)(A); (Pls.' Opp. at 5-6).  Netflix rewrites the CVAA when it states that content "prior to" the effective date is subject to the law and wrongly attributes a section of the 1996 Video Accessibility Act to CVAA.[25]  Netflix is further overbroad in asserting that "*all* streaming video programming *produced at any time*," is subject to the CVAA.  (ECF No. 43, Motion at 16, emphasis added.) Netflix misunderstands that the relevant standard for content coverage under the CVAA is not when the content is "produced," but rather when it is published or exhibited on television. (Motion at 16 *contrast with* 47 U.S.C. § 613(c)(2)(A) and 47 CFR § 79.4(b).)  Equally confounding is Netflix's assertion that the "CVAA also covers programming *not necessarily displayed on television—e.g.*, live programming (RJN Ex. B, Regulations ¶¶ 55–56); near-live programming (*id.* ¶¶ 57–58); video clips (*id.* ¶¶ 44–47); foreign programming (*id.* ¶ 50) and home video programming (*id.* ¶¶ 42, 60)." (ECF No. 43, Motion at 16.) (emphasis added.)  This content, like all content within the scope of the CVAA, is covered by the CVAA only after it has been shown on television with captions after the effective date of the regulations.

It is indisputable that the CVAA uses captioned content shown on television as the metric to determine coverage.  The ADA requires "full and equal access" to the services and goods of a public accommodation.  42 U.S.C. § 12182(a).  This basic distinction in focus and the fact that CVAA does not cover all of the Watch Instantly programming, precludes an argument that the CVAA was meant as a substitute for the ADA.

---

[25] Netflix mistakenly relies on a subpart of a section of the Communications Act that applies to the 1996 amendments requiring captions on television. *See* 47 U.S.C. 613 (a)–(b).

The cases cited by Netflix involving statutory repeal are therefore entirely distinguishable because they involve statutes that are directly in conflict. *See*, *Nat. Resources Def. Council, Inc. v. U.S. Envt'l. Prot. Agenc*y, 824 F.2d 1258, 1279 (1st Cir. 1987) (one statute allowed placement of highly dangerous wastes underground and the other required that water contained in the same formations be clean); *see also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33, 35 (2003) (holding that to apply a trademark law without an expiration would fundamentally conflict with the more applicable and specific copyright law, "which is precisely directed to that subject [and] grants the public the right to copy without attribution once a copyright has expired"); *Stewart v. Smith*, 673 F.2d 485, 492 (D.C. Cir. 1982)(holding that an exception to the ADEA was necessary to fulfill Congress's clear intent to employ maximum entry ages as a means towards securing a "young and vigorous" workforce of law enforcement officers.)[26]

### 3. The CVAA and the ADA are not in conflict and are easily harmonized.

Demonstrating no attempt to harmonize the statutes, Netflix points to no direct conflict or inconsistency between the CVAA and the ADA.  The fact that there is some overlap in the subject matter does not diminish rights under either statute.  *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992); *Rathbun v. Autozone, Inc.,* 361 F.3d 62, 68 (1st Cir. 2004) (holding that in the absence of a literal inconsistency, differential treatment of factually identical claims is not a proper ground for invoking the doctrine of repeal by implication); *Baumgardner v. County of Cook*, 108 F. Supp. 2d 1041, 1043-51 (N.D. Ill. 2000) (permitting disabled employee to assert title I-based ADA claim against county employer, as well as equal protection

---

[26]*See also Greenless v. Almond*, 277 F.3d 601, 604-06, 609 n.8 (1st Cir. 2002) (rejecting plaintiff's claim for money from a tobacco settlement based on one provision of the Medicaid Act because it could not be reconciled with a later amendment to the Act); *Kepner v. United States*, 195 U.S. 100, 125 (1904) (interpreting which section of the same act was controlling); *Sprietsman v. Mercury Marine*, 537 U.S. 51, 67 (2002)(not foreclosing separate causes of actions that overlapped with an area subject to agency regulation).

claim under § 1983 against individual supervisor, even when same facts formed basis for both claims).

Netflix asserts that there is a conflict because CVAA places primary responsibility on video owners, not distributors, like Netflix, to provide caption files. (Motion at 17.) This does not present a conflict with the ADA, as the availability of captions through the CVAA complements and is not inconsistent with Netflix's obligations under the ADA. In fact, the duty put on Video Programming Owners ("VPO") by CVAA will only help Netflix comply with its ADA obligations, by changing industry practice and requiring that content televised with captions be submitted with captions to distributors and providers. 47 C.F.R. §79.4.[27]

Second, Netflix argues that the fact that the CVAA does not have a private right of action strips Plaintiffs of the right to bring suit in federal court under the ADA.[28] This argument was thoroughly addressed by both Plaintiffs and DOJ in response to Netflix's Motion to Dismiss. (Pls.' Opp. at 5-7; DOJ Statement of Interest at 8-11.) Netflix's argument fails, not least because, as stated above, the Watch Instantly content to which Plaintiffs seek full and equal access is only partially covered by the CVAA. Additionally, that the ADA and CVAA exist as distinct "statutory vehicles" for some of the same claims, does not render the statutes irreconcilable, but rather evidences the Congressional intent to provide "separate administrative and judicial paths through which to rectify the same wrongs." *Rathbun,* 361 F.3d at 68. Even in *Zulauf v. Kentucky Educational Television*, 28 F. Supp. 2d 1022-23 (E.D. Ky. 1998), cited by Netflix, the court found that a party that files an FCC complaint is not foreclosed from pursuing

---

[27] Netflix also contends, erroneously, that the issue of copyright somehow creates a conflict between its responsibilities under the CVAA and Plaintiffs' claim under the ADA. As discussed *supra* at 9-10, this contention has no merit.

[28] Finally, CVAA's prohibition on private rights of action is expressly limited to CVAA, and does not apply to the ADA: "[n]othing in this section shall be construed to authorize any private right of action *to enforce any requirement of this section*." 47 C.F.R. §79.4(f)(emphasis added).

relief in federal courts under the ADA.  *See id.* (explaining that "after reviewing the statues at issue, the Court finds that the VPAA can co-exist with § 504 and the ADA").  This case is stronger than *Zulauf* for preserving a private right of action under the ADA, because the CVAA would not address all of the content Plaintiffs seek to access as the VPAA did in *Zulauf*.

Third, Netflix cites the CVAA "grace periods" and timelines as presenting an irreconcilable conflict with the ADA.  These do not present any conflict, however, because in establishing the CVAA timelines, the FCC sought to establish minimum compliance standards for a diverse industry, not to establish the responsibilities of one particular video provider under the ADA.[29] *Rathbun,* 361 F.3d at 68.  Moreover, as the DOJ explained, the CVAA timelines would only become relevant at the remedy stage.  (DOJ Statement of Interest at 14, n.5.)  For example, the timelines may arise in determining whether Netflix is subject to an undue burden to meet more accelerated captioning timelines than those required by the CVAA.  The extent to which CVAA timelines may be relevant, however, is unclear at this stage without further discovery.  It is not yet known, for example, how much of Netflix's content will be subject to the CVAA (and how much excluded, as discussed *supra* at 11 n.21, 14), or whether the concerns behind the grace periods and timelines established by the FCC would apply to Netflix given the amount of captioning already available or readily available for the movies and television shows now in the Watch Instantly library, or to be acquired or created in the future.

---

[29] The FCC provided a grace period for a limited amount of existing content, because "no process or method presently exists to enable VPOs to accurately identify such content, and that the task of developing one is likely to be complex." 77 Fed. Reg. 19480, 19488 (March 30, 2012).  This broad finding may be less applicable to Netflix, which lauds its captioning efforts.  Moreover, the FCC was clear to state "we note that nothing in the statute precludes the VPO, during this period [before the deadlines], from providing captions to the VPD for the archival content posted in the VPD's library." *Id.* at 19489.

Fourth, Netflix states that the exemptions in the CVAA are irreconcilable with the ADA. However, the FCC's regulations provide exemptions for content unlikely to apply to Netflix,[30] and economic hardship is similarly recognized in both statutes.[31]

For all of the aforementioned reasons, the CVAA is neither irreconcilable with the ADA nor does it impliedly repeal the ADA because there is no conflict presented by the different statutory vehicles that the legislature decided to provide claimants to "rectify [some of the] same wrongs" *Rathbun,* 361 F.3d at 68.

### 4.  NAD's advocacy for a broader interpretation of CVAA in agency proceedings is immaterial.

Advocacy by Plaintiff NAD before the FCC has no bearing on these proceedings. Netflix's argument for judicial estoppel ignores the difference between advocating for the broadest possible interpretation of what the scope of a regulation should be during the comment period, and the plain language of the regulation that results.  Civil rights membership advocacy organizations like NAD frequently advocate on behalf of their members by providing comments during rulemaking proceedings that interpret the law to provide the broadest access possible. Netflix asks the Court to hold "Plaintiffs to their previous position, put a stop to their 'intentional self-contradiction,' and prevent them from 'obtaining unfair advantage' of the parallel forums."[32]

---

[30] The only specific exemptions in the FCC regulations were for "video clips" and "outtakes," which were explicitly removed from the definition of "full length video programming." 47 C.F.R. § 79.4 (a)(2).  The FCC declined to apply the categorical exemptions to the CVAA which applied to the Telecommunications Act because "[p]rogramming that is exempt from the television closed captioning requirements and that never appears on television with captions is not subject to the IP closed captioning requirements, which by definition do not apply to programming that appears on television only without captions." *See* 77 Fed. Reg. 19480, 19496 (March 30, 2012).

[31] CVAA's prohibition on private rights of action is expressly limited to claims brought under CVAA, and does not apply to the ADA.  47 C.F.R. §79.4(f).

[32] Netflix asserts that NAD is "playing fast and loose with the courts," but provides no support for applying judicial estoppel here.  *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003).

*Id*.  Astoundingly, Netflix seems to ask the Court to hold NAD to the scope of a regulation different than the regulation issued by the FCC.

### D.  Plaintiffs' Claim Is Not Moot

Finally, for the same reasons articulated above—including that Plaintiffs claim is under the ADA, and is not displaced by the CVAA—this case is not moot merely because the FCC has issued regulations implementing the CVAA.

## III. CONCLUSION

For all the reasons stated above, Netflix's Motion should be denied.

May 15, 2012                    Respectfully Submitted,

                                NATIONAL ASSOCIATION OF THE DEAF,
                                WESTERN MASSACHUSETTS ASSOCIATION OF
                                THE DEAF AND HEARING IMPAIRED, AND
                                LEE NETTLES,

By:                             _____/s/ *Arlene Mayerson*___
                                Arlene Mayerson
                                Charlotte Lanvers
                                Shira Wakschlag
                                DISABILITY RIGHTS EDUCATION AND DEFENSE
                                FUND, INC.
                                3075 Adeline Street, Suite 210
                                Berkeley, CA  94703
                                Telephone: (510) 644-2555
                                amayerson@dredf.org
                                clanvers@dredf.org
                                swakschlag@dredf.org

                                Bill Lann Lee
                                Catha Worthman
                                Joshua Davidson
                                LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.
                                476 9th Street
                                Oakland, CA  94607-4048
                                Telephone: (510) 839-6824
                                bseligman@lewisfeinberg.com
                                blee@lewisfeinberg.com

cworthman@lewisfeinberg.com
jdavidson@lewisfeinberg.com

Christine M. Netski, BBO #546936
SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
101 Merrimac Street
Boston, MA  02114-4737
Telephone:  (617) 227-3030
netski@srbc.com