UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATIONAL ASSOCIATION | ) | |
| OF THE DEAF, et al., | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | C.A. NO. 11-CV-30168-MAP |
| | ) | |
| NETFLIX, INC., | ) | |
| Defendant | ) | |

MEMORANDUM AND ORDER REGARDING
MOTION FOR JUDGMENT ON THE PLEADINGS
(Dkt. No. 43)

June 19, 2012

PONSOR, U.S.D.J.

## I. INTRODUCTION

Plaintiffs, the National Association of the Deaf ("NAD"), the Western Massachusetts Association of the Deaf and Hearing Impaired ("WMAD/HI"), and Lee Nettles, bring this action under Title III of the Americans with Disabilities Act ("ADA") against Defendant, Netflix, Inc. ("Netflix"), for failure to provide equal access to its video streaming web site, "Watch Instantly," for deaf and hearing impaired individuals. Plaintiffs seek injunctive and declaratory relief requiring Defendant to provide closed captioning for all of its Watch Instantly content.

Defendant has filed a motion for judgment on the pleadings, arguing that Plaintiffs have failed to allege sufficient facts for a claim under the ADA, that Plaintiffs' interpretation of the ADA is precluded by the Twenty-First Century Communications and Video Accessibility Act of 2010 ("CVAA"), Pub. L. No. 111-260, 124 Stat. 2751 (codified at 47 U.S.C. § 613), and that Plaintiffs' claim is moot.  (Dkt. No. 43.)  Plaintiffs oppose Defendant's motion (Dkt. No. 46), and the Department of Justice has filed a statement of interest in opposition to Defendant's motion as well (Dkt. No. 45).  For the reasons set forth below, this motion will be denied.

## II. <u>BACKGROUND</u>

Defendant is the leading provider of streaming television and movies on the Internet through its on-demand service web site, called "Watch Instantly."  Watch Instantly allows subscribers to stream available videos through the Internet on a computer, television, or other device.

Plaintiffs NAD and WMAD/HI are non-profit organizations that advocate on behalf of deaf and hard of hearing individuals.  Plaintiff Lee Nettles is a deaf individual and

a member of both WMAD/HI and NAD.  Plaintiffs allege that
Defendant provides closed captioning, which allows deaf and
hard of hearing individuals to view television shows and
movies by reading captioned text that they can activate on
the display, for only a small portion of the titles
available on Watch Instantly.  Plaintiffs further allege
that other Netflix services are also not accessible to deaf
and hard of hearing individuals.  For example, captioned
films are not categorized in the same manner as other films,
making it impossible for deaf and hard of hearing
individuals to use Netflix's personalized film
recommendations.

On the basis of these allegations, Plaintiffs have
brought a claim under Title III of the ADA, arguing that
Defendant's failure to caption all of its streaming library
violates the ADA's prohibition of discrimination on the
basis of disability.  42 U.S.C. § 12182(a).

In response to the complaint, Defendant filed a motion
to dismiss on September 12, 2011, arguing that, by enacting
the CVAA, Congress gave the FCC primary jurisdiction to
decide the extent to which Internet streaming video

providers must offer closed captioning.  (Dkt. No. 22.)
Congress enacted the CVAA in October 2010 "to help ensure
that persons with disabilities are able to utilize
communications services and equipment and to better access
video programming."  S. Rep. No. 111-386, at 1 (2010).
Along with other technological advancements, the CVAA
addressed the closed captioning of streaming video
programming on the Internet.  The Act mandated that the
Federal Communications Commission ("FCC") issue regulations
requiring "the provision of closed captioning on video
programming delivered using Internet protocol that was
published or exhibited on television with captions after the
effective date of such regulations."  47 U.S.C. § 613(c)(2)
(A).

At the time of the hearing on Defendant's motion to
dismiss, the FCC had not yet promulgated regulations
implementing the CVAA.  The court denied Defendant's motion
on November 10, 2011, but granted a stay pending the
completion of rule-making proceedings by the FCC.  (Dkt. No.
32.)

The FCC issued its final regulations on January 13,

4

2012.  See 47 C.F.R. § 79.4.  Among other things, the regulations defined captioning responsibilities for distributors of internet video programming, set deadlines and grace periods for compliance, prohibited private rights of action, and established an administrative complaint procedure.  The regulations went into effect on April 30, 2012.  Defendant has now filed a motion for judgment on the pleadings.

### III. DISCUSSION

Defendant argues that judgment on the pleadings is required because: (1) Plaintiffs have failed to allege the existence of a "place of public accommodation," as required for a claim under the ADA; (2) Plaintiffs have failed to allege that Defendant has control over the captioning that Plaintiffs seek, as also required for a claim under the ADA; (3) Plaintiffs' interpretation of the ADA is precluded by the CVAA; and (4) Plaintiffs' claim is moot.  For the reasons set forth below, none of Defendant's arguments is persuasive.

### A. Place of Public Accommodation.

To state a claim under the ADA, a plaintiff must show

5

that the alleged discrimination involves the services of a
"place of public accommodation."  42 U.S.C. § 12182(a).
Plaintiffs in this case allege that Defendant's Watch
Instantly web site is a place of public accommodation.
(Dkt. No. 19, Am. Compl. ¶ 6.)  Defendant disputes that a
web site in general, and Watch Instantly in particular, can
be a place of public accommodation under the ADA.

The ADA lists twelve categories of entities that
qualify as places of public accommodation.  42 U.S.C. §
12181(7).  Plaintiffs argue that the Watch Instantly web
site falls within the scope of four of these categories:
"place of exhibition and entertainment," "place of
recreation," "sales or rental establishment," and "service
establishment."  Id.  According to Plaintiffs, Defendant is
a business that provides a subscription service of internet-
based streaming video through the Watch Instantly web site
and, as such, is analogous to a brick-and-mortar store or
other venue that provides similar services, such as a video
rental store.

Plaintiffs' interpretation of the statute as applying
to web-based businesses is supported by the First Circuit's

decision in <u>Carparts Distrib. Ctr. v. Auto. Wholesaler's</u>
<u>Assoc.</u>, which held that "places of public accommodation" are
not limited to "actual physical structures."  37 F.3d 12, 19
(1st Cir. 1994).  The First Circuit explained that

> [i]t would be irrational to conclude that persons
> who enter an office to purchase services are
> protected by the ADA, but persons who purchase the
> same services over the telephone or by mail are
> not.  Congress could not have intended such an
> absurd result.

<u>Id.</u>

Carparts's reasoning applies with equal force to
services purchased over the Internet, such as video
programming offered through the Watch Instantly web site.
In a society in which business is increasingly conducted
online, excluding businesses that sell services through the
Internet from the ADA would

> run afoul of the purposes of the ADA and would
> severely frustrate Congress's intent that
> individuals with disabilities fully enjoy the
> goods, services, privileges and advantages,
> available indiscriminately to other members of the
> general public.

<u>Id.</u> at 20.

Defendant argues that <u>Carparts</u> is irrelevant because
the issue here is not whether the ADA applies to non-

7

physical structures, but whether the list of public accommodations in the statute includes entities like web sites or services such as streaming video programming. Because it does not, according to Defendant, the Watch Instantly web site does not fall within the scope of the ADA.

This argument fails because the fact that the ADA does not include web-based services as a specific example of a public accommodation is irrelevant.  First, while such web-based services did not exist when the ADA was passed in 1990 and, thus, could not have been explicitly included in the Act, the legislative history of the ADA makes clear that Congress intended the ADA to adapt to changes in technology. See, e.g., H.R. Rep. 101-485 (II), at 108 (1990) ("[T]he Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times.").

Second, and more importantly, Congress did not intend to limit the ADA to the specific examples listed in each category of public accommodations.  Plaintiffs must show

only that the web site falls within a general category
listed under the ADA.  See, e.g., S. Rep. No. 116, at 59
(1990) ("[W]ithin each of these categories, the legislation
only lists a few examples and then, in most cases, adds the
phrase 'other similar' entities.  The Committee intends that
the 'other similar' terminology should be construed
liberally consistent with the intent of the legislation . .
. ."); H.R. Rep. No. 485 (III), at 54 (1990) ("A person
alleging discrimination does not have to prove that the
entity being charged with discrimination is similar to the
examples listed in the definition.  Rather, the person must
show that the entity falls within the overall category.").

　　　Plaintiffs convincingly argue that the Watch Instantly
web site falls within at least one, if not more, of the
enumerated ADA categories.  The web site may qualify as: a
"service establishment" in that it provides customers with
the ability to stream video programming through the
internet; a "place of exhibition or entertainment" in that
it displays movies, television programming, and other
content; and a "rental establishment" in that it engages
customers to pay for the rental of video programming.  42

U.S.C. § 12181(7).

Defendant next argues that the Watch Instantly web site cannot be a place of public accommodation because it is accessed only in private residences, not in public spaces. According to Defendant, every specific example of a public accommodation in the ADA refers to a public arena that involves people outside of the home (e.g., motion picture house, bakery, laundromat, zoo, and the like).  Under the doctrine of ejusdem generis -- which provides that "where general words . . . follow the enumeration of particular classes of things . . . , the general words will be construed as applying only to things of the same general class as those enumerated," United States v. McKelvey, 203 F.3d 66, 71 (1st Cir. 2000) -- Defendant argues that all "public accommodations" must be accessed outside of a private residence.

Again, this argument is unpersuasive.  The ADA covers the services "of" a public accommodation, not services "at" or "in" a public accommodation.  42 U.S.C. § 12182(a).  This distinction is crucial.  Accord Nat'l Fed'n of the Blind v. Target Corp., 452 F. Supp. 2d 946, 953 (N.D. Cal. 2006)

10

("The statute applies to the services <u>of</u> a place of public accommodation, not services <u>in</u> a place of public accommodation.  To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute.").  Consequently, while the home is not itself a place of public accommodation, entities that provide services in the home may qualify as places of public accommodation.

Under Defendant's reading of the statute, many businesses that provide services to a customer's home -- such as plumbers, pizza delivery services, or moving companies -- would be exempt from the ADA.  The First Circuit held in <u>Carparts</u> that such an interpretation is absurd.  37 F.3d at 19 (extending the ADA to businesses that offers services to customers in their homes through the telephone or mail).  Under the <u>Carparts</u> decision, the Watch Instantly web site is a place of public accommodation and Defendant may not discriminate in the provision of the services of that public accommodation -- streaming video -- even if those services are accessed exclusively in the home.

11

B. <u>Control</u>.

To plead a violation of the ADA, a plaintiff must also show that a defendant "owns, leases (or leases to), or operates" a place of public accommodation.  42 U.S.C. § 12182(a).  The First Circuit has not addressed the meaning of "owns, leases [], or operates," but other courts have held that the relevant inquiry is whether the defendant "specifically controls the modification of the [things at issue] to improve their accessibility to the disabled." <u>Neff v. Am. Dairy Queen Corp.</u>, 58 F.3d 1063, 1066 (5th Cir. 1995).  At least one court in the District of Massachusetts has adopted this definition.  <u>See</u> <u>Gluckenberger v. Boston Univ.</u>, 957 F. Supp. 306, 322-23 (D. Mass. 1997).

Defendant argues that Plaintiffs must, and have failed to, allege that Defendant controls the captioning of streaming video content.  According to Defendant, owners of video programming -- not distributors, like Defendant -- hold the exclusive copyrights necessary to caption content. Because Defendant cannot caption content without the copyright owners' permission, it follows that Defendant does not control the captioning of video programming and

12

therefore cannot be liable under the ADA.

Once again, this argument lacks traction.  Plaintiffs have pled that Defendant owns and operates the Watch Instantly web site -- a place of public accommodation -- and that Defendant has stated that it is working to provide captioning for the content on Watch Instantly.  (Dkt. No. 19, Am. Compl. ¶¶ 13, 16-20, 26.)  These allegations are sufficient at this stage of the litigation to establish that Defendant "owns, leases [], or operates" a place of public accommodation for purposes of the ADA.

The cases Defendant cites in which courts have granted motions to dismiss or for summary judgment on the basis of a lack of control are distinguishable from the case at hand in that they concerned defendants who did not actually own or operate a place of public accommodation.  See, e.g., Pickern v. Pier 1 Imps. (U.E.), Inc., 457 F.3d 963, 965-67 (9th Cir. 2006) (affirming grant of summary judgment and holding that a store was not liable for installing a ramp across a city-owned strip of grass between the sidewalk and store because the store did not own that strip of grass); Neff, 58 F.3d at 1066-68 (affirming grant of summary judgment where a

13

franchisor with limited control over a franchisee's store,
as outlined by the franchise agreement, did not operate a
place of public accommodation); Gluckenberger, 957 F. Supp.
at 322-23 (granting motion to dismiss ADA claim as to one
university employee on the ground that employee did not have
decision-making power over the university's operations).  In
this case, on the other hand, Defendant fully owns and
operates a place of public accommodation, but would
potentially be unable to make the modifications desired by
Plaintiffs for other reasons.

While further discovery may reveal that, even though
Defendant owns the Watch Instantly web site, it does not
have the power to provide the captioning Plaintiffs seek due
to copyright issues, this question is not properly before
the court now.  There is currently no evidence before the
court concerning how much of the streaming content and
associated copyrights Defendant owns, what the terms of
Defendant's agreements with other copyright owners may be
(including whether Defendant already has permission to
caption content), and whether content is delivered to
Defendant with or without captioning.  This issue may be

14

revisited on a motion for summary judgment.

C. <u>CVAA</u>.

In the alternative, Defendant argues that, even if Plaintiffs adequately pled a claim under the ADA, interpreting the ADA to cover the captioning of streaming video programming would create an irreconcilable conflict with the CVAA.  Consequently, according to Defendant, the court should read the CVAA as removing the captioning of video programming from the scope of the ADA.  Plaintiffs respond, first, that the statutes are compatible and, second, that Congress could not have intended the CVAA to supplant the ADA because the CVAA applies to only a small subset of streaming video programming.  A review of the statutes and the pertinent authorities reveals that Plaintiffs are correct: the CVAA was clearly intended to complement, not supplant, the ADA.

1. <u>Irreconcilable Conflict</u>.

It is well-established that, when there is a conflict between two statutes, "the most recent and more specific congressional pronouncement will prevail over a prior, more generalized statute."  <u>Nat. Res. Def. Council, Inc. v. U.S.</u>

Envt'l Prot. Agency, 824 F.2d 1258, 1278 (1st Cir. 1987).

According to Defendant, there is an irreconcilable conflict

between the CVAA and the ADA when applied to captioning of

streaming video.  Because the CVAA specifically addresses

such captioning while the ADA covers disability

discrimination generally, Defendant argues that Congress

intended the CVAA to "carve out" the captioning of streaming

video programming from the scope of the ADA.[1]   Stewart v.

---

[1] The parties disagree on what doctrine of statutory
interpretation should apply.  Plaintiffs contend that using
the CVAA to repeal portions of the ADA contravenes the
strong presumption against implied repeals.  See Branch v.
Smith, 538 U.S. 254, 273 (2003) ("An implied repeal will
only be found where the provisions in two statutes are in
irreconcilable conflict, or where the latter act covers the
whole subject of the earlier one and is clearly intended as
a substitute.").
     Defendant argues that the doctrine of implied repeal is
irrelevant because the CVAA "carves out" a specific subject-
matter from the ADA; it does not "repeal" any provisions of
the ADA.  These doctrines, according to Defendant, are
distinct.  See Greenless v. Almond, 277 F.3d 601, 608-09
(1st Cir. 2002) ("The 'implied repeal' argument is an odd
one because at issue is not whether Congress totally
repealed [the older statutory provision], but whether it
intended to carve out [a specific subject matter] from the
reach of that provision.").
     Regardless of which doctrine applies or whether they
are substantially different, if there is no conflict between
the statutes -- as Plaintiffs argue and the court concludes
-- neither an implied repeal nor a carve out is appropriate
without indication from Congress to the contrary.

16

Smith, 673 F.2d 485, 492 (D.C. Cir. 1982) ("When one statute speaks in general terms while the other is specific, conflicting provisions may be reconciled by carving out an exception from the more general enactment for the more specific statute.").

Defendant argues that Plaintiffs' interpretation of the ADA is irreconcilable with the CVAA and the accompanying FCC regulations in four distinct aspects. In each instance, however, Defendant has not made a showing that complying with the ADA would be inconsistent with its obligations under the CVAA. The two statutes can coexist even though they cover overlapping subject matter.

The first potential conflict between the statutes arises from the FCC regulations, which charge video content owners -- not distributors, like Netflix -- with primary responsibility for captioning. 47 C.F.R. § 79.4(c)(1). Plaintiffs of course seek to impose responsibility for captioning on Defendant, a distributor, under the ADA.

While it is true that Plaintiffs seek to impose a duty on Defendant under the ADA that may not exist under the CVAA, this difference does not constitute an irreconcilable

17

conflict.  If the court eventually finds that Defendant has a duty to provide captioning under the ADA, the responsibility to perform that duty would not contravene any provision of the CVAA.  In other words, Defendant could comply with the requirements of both statutes without contradiction.  Indeed, as Plaintiffs suggest, the duty imposed by the CVAA on owners of video programming may make it easier for Defendant to comply with its alleged duties under the ADA.

The second potential conflict arises from the timeliness of captioning.  The FCC regulations establish a schedule of compliance deadlines for the captioning of programming, which ranges from September 30, 2012 to March 30, 2014 depending on the type of programming, when it is shown on television, and whether it is already in the distributor's library.  47 C.F.R. §79.4(b).  Plaintiffs seek equitable relief requiring immediate captioning of all of Defendant's Watch Instantly content.

The fact that the ADA may require Defendant to comply with a different time line than that set by the CVAA does not create an irreconcilable conflict because, once again,

18

Defendant can comply with both statutes.  Cf. Rathbun v. Autozone, Inc., 361 F.3d 62, 70 (1st Cir. 2004) (holding that a "legislature's decision to offer claimants separate administrative and judicial paths through which to rectify the same wrongs" will inevitably lead to different treatment of factually identical claims).  While the schedule established by the FCC undoubtedly reflects informed decisions regarding the technological and economic difficulties of captioning, the FCC time line reflects only minimum compliance standards that apply to a diverse industry.  Not all of the concerns motivating the FCC's schedule will necessarily apply to the defendant in this particular case.  If the court finds that Defendant has a duty to provide closed captioning under the ADA, it may itself consider the appropriate time line for compliance, taking into account the technological and economic burdens on Defendant, under the ADA's "undue burden" analysis after further discovery.  42 U.S.C. § 12182(b)(2)(A)(iii).

The third potential conflict cited by Defendant arises from the CVAA's prohibition of "private rights of action." 47 U.S.C. § 613(j).  In accordance with this prohibition,

the FCC regulations created an administrative complaint
procedure through which viewers could alert the FCC to
violations of the Act.  47 C.F.R. § 79.4(e).  Defendant
argues that Plaintiffs are attempting to circumvent this
administrative process by filing suit under the ADA.

Like the previous two provisions cited by Defendant,
this conflict is also illusory.  The existence of an
administrative complaint procedure under the CVAA is
entirely consistent with a private right of action under the
ADA for the same wrong.  See Rathbun, 361 F.3d at 70
(explaining that Congress may provide "separate
administrative and judicial paths through which to rectify
the same wrongs" without creating an irreconcilable
conflict).  Indeed, when interpreting the CVAA's
predecessor, the Telecommunications Act of 1996, Pub. L. No.
104-104, 110 Stat. 126, in a case concerning the alleged
failure to provide closed captioning for television
broadcasts, at least one district court held that plaintiffs
retained a right to sue under the ADA despite the existence
of an administrative complaint procedure under the
Telecommunications Act.  See Zulauf v. Kentucky Educ.

20

<u>Television</u>, 28 F. Supp. 2d 1022, 1023-24 (E.D. Ky. 1998).[2]
There is no indication that the CVAA, unlike the
Telecommunications Act, extinguishes private rights of
action under the ADA for closed captioning of video
programming on the Internet.

The fourth and final potential conflict between the
statutes arises from a provision in the CVAA that permits
the FCC to exempt captioning that would be "economically
burdensome" from the requirements of the CVAA.  47 U.S.C. §
613(c)(2)(D)(ii).  The FCC regulations detail what qualifies
as an exception to liability based on economic burden.  47
C.F.R. § 79.4(d).  The regulations also provide that "a <u>de</u>

---

[2] In <u>Zulauf</u>, the court held that the plaintiff had to
first exhaust his remedies under the Telecommunications Act
before filing suit under the ADA.  28 F. Supp. 2d at 1023-
24.  Such a requirement, however, would not be appropriate
in this case.

As will be discussed later in this memorandum, some of
Plaintiffs' claims may fall outside of the scope of the
CVAA, leaving no administrative remedies for those claims.
However, attempting to separate the claims that are covered
by the CVAA from those that are not is impractical as the
CVAA's coverage of video programming fluctuates depending on
whether and when that programming is shown on television.
<u>See</u> <u>infra</u> Part III, Section C.2.  Consequently, permitting
Plaintiffs to litigate the entirety of their ADA claim
without first exhausting the CVAA's administrative remedies
would promote efficiency and avoid undue delay.

minimis failure to comply . . . shall not be treated as a
violation of the [CVAA's] requirements." Id. § 79.4(c)(3).
Defendant argues that Plaintiffs seek to hold it liable
under the ADA without taking these exceptions into account.

Defendant's argument overlooks the fact that the ADA
also recognizes the need to take economic hardship into
account when determining the extent of a defendant's duties.
See 42 U.S.C. § 12182(b)(2)(A)(iii) (creating an "undue
burden" exception under the ADA).  Under the ADA, the court
will conduct an analysis of the economic burden of
captioning on Defendant at a later stage of this litigation
that will take into account factors that are similar to
those considered by the FCC regulations.  Furthermore, under
the economic burden analysis, the court may determine that
the ADA also forecloses liability for a de minimis lack of
captioning that was reasonable under the circumstances.

In sum, although the subject matter of the CVAA
overlaps with that of the ADA and the two statutes to some
extent impose different requirements on distributors of
video programming, such as Defendant, none of these
differences create a "positive repugnancy" between the two

laws.  <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253 (1992)
(internal quotation omitted).  As such, the court must give
effect to both statutes.  <u>Id.</u> ("Redundancies across statutes
are not unusual events in drafting, and so long as there is
no 'positive repugnancy' between two laws . . . a court must
give effect to both." (internal citation omitted)).

 2. <u>Scope of the CVAA</u>.

 In addition to the lack of any irreconcilable conflict
between the two statutes, Plaintiffs argue that the CVAA and
ADA are also not co-extensive in the scope of the video
programming they cover.  While the ADA covers the entirety
of Plaintiffs' claim, the CVAA applies to only a portion of
the video programming that Plaintiffs allege Defendant has
failed to caption.  The limited scope of the CVAA, according
to Plaintiffs, suggests that Congress did not intend the
CVAA to supplant, implicitly repeal, or carve out a section
of the ADA because doing so would leave many plaintiffs
without a remedy for significant instances of
discrimination.

 The CVAA mandates that the FCC regulations "require the
provision of closed captioning on video programming

23

delivered using Internet protocol that was published or
exhibited on television with captions after the effective
date of such regulations." 47 U.S.C. § 613(c)(2)(A).  The
FCC regulations implementing the CVAA, in turn, require
closed captioning of "full-length video programming
delivered using Internet protocol . . . if the programming
is published or exhibited on television in the United States
with captions on or after [certain] dates . . . ." 47
C.F.R. § 79.4(b).  "[F]ull-length video programming" is
defined as "video programming that appears on television and
is distributed to end users, substantially in its entirety,
via Internet protocol . . . ." Id. § 79.4(a)(2).

Plaintiffs argue that, under the terms of the CVAA and
the FCC regulations, the CVAA applies only to programming
that is (1) shown on television, (2) with captions, and (3)
after the effective date of the FCC regulations.  Plaintiffs
allege that the Watch Instantly web site includes
programming that does not fall within this narrow scope,
including original Netflix content that has never been shown
on television, programming that was shown on television
before the effective date of the regulations, and foreign

programming that is shown exclusively on Netflix in the United States.  Likewise, Netflix's recommendation system, which is also the subject of the ADA claim, is not covered by the CVAA.

Defendant disagrees with Plaintiffs' interpretation of the CVAA's scope.  During the hearing on Defendant's motion, counsel for Defendant conceded that the current FCC regulations limit the type of programming that must be captioned.  Defendant argues, however, that the CVAA is broader in scope than the FCC regulations.[3]  In other words, according to Defendant, the FCC made a conscious choice, after balancing the benefits and burdens of captioning, to issue regulations that require captioning of only a subset

---

[3] Defendant contends that Plaintiff NAD previously argued in public comments to the FCC during rule-making proceedings that the CVAA applies to all video programming published or exhibited on television at any time.  Defendant argues that Plaintiffs should now be bound by their prior interpretation of the Act.  However, NAD's representations before the FCC in an administrative proceeding have no bearing on these judicial proceedings.  The cases Defendant cites in support of its argument are inapposite.  See, e.g., InterGen N.V. v. Grina, 344 F.3d 134, 144-45 (1st Cir. 2003) ("[T]he doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant . . . in a prior legal proceeding." (emphasis added)).

of the video programming that falls within the scope of the CVAA.

First, Defendant argues that the CVAA is not limited to programming that was shown on television, but applies to all video programming delivered via the Internet.  The FCC regulations define "video programming" as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 C.F.R. § 79.4(a)(1).  Streaming video programming that is not shown on television, according to Defendant, is "comparable to" programming shown on television.  Defendant further argues that when the CVAA refers to "published or exhibited on television," the phrase "on television" modifies only the word "exhibited."  47 U.S.C. § 613(c)(2)(A).  Thus, according to Defendant, the CVAA applies to (1) all programming that is "published" and (2) all programming that is "exhibited on television." Defendant argues that Plaintiffs' interpretation, which requires that programming be shown on television to be covered by the CVAA, renders the word "published" superfluous.

Second, Defendant argues that the CVAA applies to all programming, regardless of when it was published.  The Telecommunications Act of 1996, which concerned captioning of video programming on television, required the FCC to issue regulations ensuring that

> (1) video programming first published or exhibited <u>after</u> the effective date of such regulations is fully accessible through the provision of closed captions, except as provided in subsection (d) of this section; and

> (2) video programming providers or owners maximize the accessibility of video programming first published or exhibited <u>prior</u> to the effective date of such regulations through the provision of closed captions, except as provided in subsection (d) of this section.

<u>Id.</u> § 613(b) (emphasis added).  Defendant argues that the CVAA incorporates these provisions by reference and, thus, applies to video programming that was published both before and after the effective date of the regulations.  <u>Id.</u> § 613(c)(1) ("The regulations prescribed pursuant to subsection (b) shall include an appropriate schedule of deadlines for the provision of closed captioning of video programming once published or exhibited on television.").

Defendant's interpretation of the CVAA is untenable.

27

First, and most importantly, it is inconsistent with the plain language of the statute, which "require[s] the provision of closed captioning on video programming delivered using Internet protocol that was published or exhibited <u>on television</u> with captions <u>after</u> the effective date of such regulations."  47 U.S.C. § 613(c)(2)(A) (emphasis added).

Furthermore, as Defendant concedes, its interpretation is in direct conflict with the FCC regulations, which make clear that only programming that is shown on television after the effective date of the regulations is subject to the regulations.  <u>See</u> 47 C.F.R. § 79.4(a)(2) (defining "full-length video programming" as "video programming that appears on television . . . ."); <u>id.</u> § 79.4(b) (requiring closed captioning for "full-length video programming delivered using Internet protocol . . . if the programming is published or exhibited on television in the United States with captions on or after the following dates . . . .").  Nothing in the regulations or in the FCC's commentary to the regulations suggests that the FCC intended the scope of the regulations to be narrower than that of the CVAA.  On the

28

contrary, the FCC's commentary suggests that, under the
FCC's interpretation of the statute, the limitations imposed
by the FCC regulations stem from the limitations in the CVAA
itself.  <u>See</u> 77 Fed. Reg. 19480, 19489 n.34 (March 30, 2012)
("We interpret Section 202(b) [of the CVAA] to cover any
programming delivered to consumers using [internet
protocol], provided that the programming was published or
exhibited on television with captions after the effective
date of the regulations.  We believe that this
interpretation is consistent with the language, history, and
purpose of the statute.").  The FCC's interpretation is
entitled to deference by the courts.  <u>Chevron U.S.A. Inc. v.
Natural Res. Def. Council</u>, 467 U.S. 837 (1984).

     Finally, Defendant's interpretation is also belied by
the CVAA's legislative history, which uses the phrase
"transmitted for display on television" interchangeably with
"published or exhibited on television," removing any
potential ambiguity from the latter phrase.  <u>See</u> H.R. 3101,
§ 202(2)(A) ("[T]he regulations shall apply to video
programming . . . in so far as such programming is
transmitted for display on television in digital format.").

This analysis makes it manifest that the scope of the CVAA, unlike that of the ADA, is limited to video programming that was shown on television with captions after the effective date of the FCC regulations.  As a result, the CVAA does not cover all of the streaming video programming and other services that are the subject of Plaintiffs' ADA claim.  Interpreting the CVAA as repealing or carving out portions of the ADA would leave litigants, such as Plaintiffs, without any remedy for potential violations of the ADA.  Without a clear indication from Congress, the court will not limit the ADA in this way.

D. Mootness.

Finally, Defendant argues that Plaintiffs' claim is moot now that the FCC regulations have gone into effect. This argument is intertwined with Defendant's other arguments that have been rejected above.  The CVAA does not cover all programming that is the subject of Plaintiffs' claim and it does not carve out any exceptions to the ADA. Because Plaintiffs' claim is brought under the ADA, the fact that the FCC regulations have gone into effect is irrelevant.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for

Judgment on the Pleadings (Dkt. No. 43) is hereby DENIED.

It is so Ordered.


<u>/s/ Michael A. Ponsor</u>
MICHAEL A. PONSOR
U. S. District Judge